1  MUNGER, TOLLES & OLSON LLP
   RONALD L. OLSON (State Bar No. 44597)
2  *Ron.Olson@mto.com*
   JOHN W. SPIEGEL (State Bar No. 78935)
3  *John.Spiegel@mto.com*
   JOHN M. RAPPAPORT (State Bar No. 254459)
4  *John.Rappaport@mto.com*
   355 South Grand Avenue, Thirty-Fifth Floor
5  Los Angeles, CA  90071-1560
   Telephone:  (213) 683-9100
6  Facsimile:  (213) 687-3702

7  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
   (*Pro hac vice applications to be filed*)
8  BRAD S. KARP
   *bkarp@paulweiss.com*
9  THEODORE V. WELLS, JR.
   *twells@paulweiss.com*
10 BETH A. WILKINSON
   *bwilkinson@paulweiss.com*
11 LYNN B. BAYARD
   *lbayard@paulweiss.com*
12 1285 Avenue of the Americas
   New York, NY 10019-6064
13 Telephone:  (212) 373-3000
   Facsimile:  (212) 757-3990
14
   Attorneys for Defendants
15 NATIONAL FOOTBALL LEAGUE
   and NFL PROPERTIES LLC
16
                UNITED STATES DISTRICT COURT
17
              CENTRAL DISTRICT OF CALIFORNIA
18

| | |
|---|---|
| 19  JOSEPH SWEET and M. STORME SWEET, his wife; MICHAEL R. BALDASSIN and MARY BALDASSIN, his wife; TONY BOUIE and ALLISON BOUIE, his wife; IRV CROSS and ELIZABETH CROSS, his wife; LARRY EDWARDS; PAUL FLATLEY; DAVID L. GRAYSON, JR.; MELVIN HOOVER; KRISTIE LONG, Administratrix of the Estate of DOUG LONG, DECEASED; MARVIN MATTOX; MICHAEL McKIBBEN and RANDI McKIBBEN, his wife; BRUCE McNORTON; REGGIE REMBERT; GREG TURNER and RHONDA TURNER, his wife; DELVIN WILLIAMS; STEVEN KENNEY; RALPH GREGORY SAMPSON; ERIC SMEDLEY; BENJAMIN STANLEY; CASEY FITZSIMMONS; JOHN FARRIS; CHARLES BEATTY; EDWARD BELL; | CASE NO. CV12-10184 DDW (JCLx)  **NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. § 1441**  **COMPLAINT FILED**: Los Angeles Superior Court Case No.:  BC 494568 Date Filed:  October 25, 2012 |

1   SAMUEL BLACKWELL; JERAMETRIUS
    BUTLER; ROOSEVELT COLLINS JR.;
2   DENNIS DEVAUGHN; ROBERT FARMER
    II; CEDRICK HARDMAN; LARRY
3   MALLORY; COREY MAYFIELD;
    VINCENT McCOY; ERIC MITCHEL;
4   JERRY OVERTON; ISIAH ROBERTSON;
    DAVID SMITH; RALPH STOCKEMER;
5   BOBBY WATKINS JUNIOR; MIKELL
    WILLIAMS; JEFFREY SEVERSON;
6   EVERETT LITTLE; BERNARDO HARRIS;
    ANTHONY BANKS; ANTHONY CURTIS;
7   RONALD DAVIS; JOHN MILKS; JOHN
    CORKER; WILLIAM RAY MICKENS;
8   BRANDON CHRISTENSON; MICHAEL
    ALFORD; REUBEN GIBSON; LARRY
9   BATES; DONALD MOSEBAR; RICHARD
    VAN DRUTEN; DAVID RICHARDS;
10  WILLIAM KEITH WRIGHT; WALTER
    WILLIAMS; CEPHUS WEATHERSPOON;
11  ANDRE PRESIDENT; RON SMITH; DEON
    ANDERSON; DONNELL SMITH;
12  RICHARD STAFFORD,

13
              Plaintiffs,
14
    v.
15
    NATIONAL FOOTBALL LEAGUE; NFL
16  PROPERTIES LLC; RIDDELL, INC. d/b/a
    RIDDELL SPORTS GROUP, INC.; ALL
17  AMERICAN SPORTS CORPORATION,
    d/b/a RIDDELL/ALL AMERICAN;
18  RIDDELL SPORTS GROUP, INC.;
    EASTON-BELL SPORTS, INC.; EASTON-
19  BELL SPORTS, LLC; EB SPORTS
    CORP.; and RBG HOLDINGS CORP., and
20  JOHN DOES 1through 100, Inclusive,

21            Defendants.

22

23  TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

24  CENTRAL DISTRICT OF CALIFORNIA:

25          PLEASE TAKE NOTICE that, for the reasons set forth below,

26  Defendants National Football League ("NFL") and NFL Properties LLC ("NFLP,"

27  and together with the NFL, the "NFL Defendants"), by their undersigned attorneys,

28

19364715.1                              - 2 -            NOTICE OF REMOVAL OF CIVIL
                                                         ACTION UNDER 28 U.S.C. § 1441

1  file this Notice of Removal to remove the claims against them in this action from

2  the Superior Court of the State of California, Los Angeles County, to the United

3  States District Court for the Central District of California pursuant to 28 U.S.C. §§

4  1367, 1441 and 1446.  Removal is made pursuant to 28 U.S.C. § 1331 on the basis

5  of federal question jurisdiction.  The grounds for removal are as follows:

6  **I.     INTRODUCTION AND BACKGROUND**

7          1.     On November 1 and November 5, 2012, the NFL Defendants

8  were served by Plaintiffs, a group of 62 former NFL players and some of their

9  wives, and one deceased former player represented by an administratrix, with a

10  Summons and Complaint (the "Complaint") filed in the Superior Court of the State

11  of California, Los Angeles County, No. BC494568.  Copies of these papers and

12  other documents filed in the action are annexed as **Exhibit A**.

13          2.     The Complaint alleges, among other things, that the NFL failed

14  to "warn [its] players of . . . the risks of head injuries" and fraudulently

15  misrepresented "that there was no link between repetitive traumatic head impacts

16  and later-in-life cognitive/brain injury." (Compl. ¶¶ 581, 594, 604, 616, 623.)  The

17  Complaint further alleges that the NFL Defendants breached their "duty to ensure

18  that the equipment it licensed and approved were of the highest possible quality

19  and sufficient to protect the NFL players." (Compl. ¶ 655.)  The Complaint

20  purports to allege causes of action for fraudulent concealment, fraud, negligent

21  misrepresentation, negligence, loss of consortium, negligent hiring, negligent

22  retention, wrongful death, and civil conspiracy/fraudulent concealment against the

23  NFL, and loss of consortium, wrongful death and negligence against the NFL

24  Defendants. (Compl. ¶¶ 577-657, 679-82.)  The Complaint also purports to allege

25  causes of action for loss of consortium, wrongful death, strict liability for design

26  defect, failure to warn and negligence against Riddell, Inc. d/b/a Riddell Sports

27  Group, Inc.; All American Sports Corp. d/b/a Riddell/All American; Riddell Sports

28  Group, Inc.; Easton-Bell Sports, Inc.; Easton-Bell Sports, LLC; EB Sports Corp.;

1    and RBG Holdings Corp. (collectively, the "Riddell Defendants").   (Compl. ¶¶

2    631-34, 648-53, 658-78.)   Plaintiffs seek recovery of compensatory and general

3    damages, special and incidental damages, punitive damages, and costs.  (Compl.

4    pp. 91-92.)

5           3.     The relationship between the NFL Defendants and many of the

6    former player Plaintiffs is governed by various collective bargaining agreements

7    ("CBAs") that were executed and operative during their careers.  The CBAs are the

8    product of exhaustive arm's-length negotiations between, on the one hand, the

9    NFL or the NFL Management Council (the exclusive bargaining representative of

10   the NFL Clubs), and, on the other hand, the NFL Players Association (the

11   exclusive bargaining representative of NFL players), and "represent[] the complete

12   understanding of the parties on all subjects covered [t]herein."   (NFL CBA

13   Preamble and Art. II § 1 (1977-87); NFL CBA Art. III § 1 (1993-2010); *see also*

14   NFL CBA Preamble and Art. I § 2 (1968-70); NFL CBA Preamble and Art. II § 4

15   (1970-77).)  The CBAs include, among other terms, provisions relating to player

16   medical care and safety, equipment and dispute resolution.

17   **II.     GROUNDS FOR REMOVAL**

18          4.     This Court has original jurisdiction of this action under 28

19   U.S.C. § 1331 because the action is one that is founded on a claim or right "arising

20   under the Constitution, laws, or treaties of the United States."  A defendant may

21   remove an action to federal court under 28 U.S.C. § 1441 if the complaint presents

22   a federal question, such as a federal claim. *See Avco Corp.* v. *Aero Lodge No. 735*,

23   390 U.S. 557, 560, 88 S. Ct. 1235, 1237, 20 L. Ed. 2d 126 (1968).

24          5.     Federal question jurisdiction exists in this case based on

25   complete preemption of Plaintiffs' claims under section 301 of the Labor

26   Management Relations Act ("LMRA").[1]  *See Young* v. *Anthony's Fish Grottos,*

27   _____

28   [1] The CBAs were signed by the NFL Management Council, an entity created by
     the NFL for the purpose of collective bargaining.  The NFL is bound by the

19364715.1                          - 4 -                    NOTICE OF REMOVAL OF CIVIL
                                                             ACTION UNDER 28 U.S.C. § 1441

1    *Inc.*, 830 F.2d 993, 998 (9th Cir. 1987) ("[I]f federal law completely preempts a

2    state law claim and supplants it with a federal claim, the state law claim may be

3    removed to federal court.").

4           6.      To the extent that any claim in the Complaint is not preempted,

5    it "form[s] part of the same case or controversy."  28 U.S.C. § 1367(a).  This Court

6    thus has supplemental jurisdiction over all claims and parties.  *See Bobadilla-*

7    *German* v. *Bear Creek Orchards, Inc.*, 641 F.3d 391, 394 (9th Cir. 2011) (holding

8    that district court "had jurisdiction over [plaintiffs'] state-law claims under 28

9    U.S.C. § 1367"); *Garcia* v. *Am. Red Cross*, No. CV-92 2513, 1992 WL 470325, at

10   *1 (C.D. Cal. Aug. 12, 1992) (denying plaintiffs' motion for remand based on lack

11   of jurisdiction over a pendent party co-defendant).

12          7.      Section 301 of the LMRA provides that the federal courts have

13   original jurisdiction over all "[s]uits for violation of contracts between an employer

14   and a labor organization."  29 U.S.C. § 185(a).  The Supreme Court has held that

15   "questions relating to what the parties to a labor agreement agreed, and what legal

16   consequences were intended to flow from breaches of that agreement, must be

17   resolved by reference to uniform federal law, whether such questions arise in the

18   context of a suit for breach of contract or in a suit alleging liability in tort."  *Allis-*

19   *Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 211, 105 S. Ct. 1904, 1911, 85 L.E.2d 206

20   (1985); *see also Hubbard* v. *United Airlines, Inc.*, 927 F.2d 1094, 1098-99 (9th Cir.

21   1991) (holding that plaintiff's fraud and RICO claims were preempted because

22   allegations "involve[d] violation of a right created by the CBA").  Thus, section 301

23   preempts tort claims seeking to vindicate "state-law rights and obligations that do

24   not exist independently of [collective bargaining] agreements" and also claims

25

26   CBAs' terms and may invoke section 301 preemption because plaintiffs' claims
     arise under the CBA and require the Court to interpret numerous CBA provisions.
27   *See Atwater* v. *Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1178-79
28   (11th Cir. 2010).

1  "substantially dependent upon analysis of the terms of [a collective-bargaining]

2  agreement." *Allis-Chalmers*, 471 U.S. at 213, 220; *Young*, 830 F.2d at 1001

3  (holding that plaintiff's fraud and misrepresentation claims were preempted by

4  section 301).

5          8.      Plaintiffs' claims are preempted because resolution of those

6  claims, and the scope of any duty owed by the NFL, is "inextricably intertwined

7  with consideration of the terms of [the CBAs]" or "substantially dependent" on an

8  analysis of the relevant provisions of the CBAs. *Allis-Chalmers*, 471 U.S. at 213,

9  215, 220; *see also Maxwell* v. *Nat'l Football League*, No. 11-cv-08394 R(MANx),

10 Order at 2 (C.D. Cal. Dec. 8, 2011) (concussion-related negligence claim against

11 NFL preempted); *Pear* v. *Nat'l Football League*, No. 11-cv-08395 R(MANx),

12 Order at 2 (C.D. Cal. Dec. 8, 2011) (same); *Barnes* v. *Nat'l Football League*, No.

13 11-cv-08395 R(MANx), Order at 2 (C.D. Cal. Dec. 8, 2011) (same); *Duerson* v.

14 *Nat'l Football League*, No. 12 C 2513, 2012 WL 1658353, at *6 (N.D. Ill. May 11,

15 2012) (same); *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 909-10

16 (S.D. Ohio 2007) (wrongful death claim arising out of heat-related illness against

17 the NFL preempted because resolution of the claim was substantially dependent

18 upon an analysis of CBA provisions related to NFL player medical care and

19 treatment).

20         9.      For example, resolution of Plaintiffs' claims will require

21 interpretation of provisions of the CBAs relating to player medical care and

22 equipment safety. *See, e.g.*, NFL CBA Art. XXXI § 1 (1982-87) (requiring

23 physician to inform player of "physical condition which could adversely affect the

24 player's . . . health"), Art. XLIV § 1 (1993-2010) (requiring physician on staff of

25 Member Clubs to inform a player in writing if he has a physical condition that

26 "could be significantly aggravated by continued performance"); NFL CBA Art.

27 XXXI § 2 (1982-87), Art. XLIV § 2 (1993-2010) ("[F]ull-time head trainers and

28 assistant trainers . . . [must] be certified by the National Athletic Trainers

association."); Constitution and By-Laws for Major Professional Football Operations as Conducted by the National Football League and the American Football League (the "1968 Joint Constitution") Art. XIX, § 19.5 (1968-69), NFL Constitution and Bylaws Art. XIX § 19.5 (1970-2010) (requiring that the home team provide a doctor and ambulance for each game); NFL Constitution and Bylaws Art. XVII supplement p. 12 (1980), Art. XVII (1984-87), Art. XVII § 17.16(E) (1988-2010) ("All determinations of recovery time for major and minor injuries must be by the club's medical staff and in accordance with the club's medical standards" for players categorized as "Reserve/Injured" on the Reserve List); CBA Art. XI § 7 (1977-87), Art. XIII § 1(a) (1993-2010) (creating a Joint Committee to study, among other things, player safety issues); CBA Art. XXXI § 3 (1982-87), Art. XLIV § 3 (1993-2010) ("A player will have the opportunity to obtain a second medical opinion," and the Club shall bear "the responsibility" for "the costs of [these] medical services.").[2] The Court will be required to interpret these provisions to determine the scope of the NFL's duty and to determine whether the NFL acted reasonably in light of the provisions.

10. Indeed, two separate district courts—including this Court in *Maxwell*, *Pear*, and *Barnes*—considering allegations similar to those alleged here have recently determined that the NFL properly removed complaints brought by former NFL players because resolution of their concussion-related negligence claims was substantially dependent on, and inextricably intertwined with, an analysis of CBA provisions concerning medical care and treatment of NFL players. In *Maxwell*, *Pear*, and *Barnes*, this Court, finding *Stringer* "to be persuasive," held

[2] *See Clarett* v. *Nat'l Football League*, 369 F.3d 124, 142 (2d Cir. 2004) ("In the [CBA], the union agreed to waive any challenge to the Constitution and Bylaws and thereby acquiesced in the continuing operation of the . . . rules contained therein."); *see also Brown* v. *Nat'l Football League*, 219 F. Supp. 2d 372, 386 (S.D.N.Y. 2002) ("[The NFL Constitution and Bylaws were] bargained over and included within the scope of the CBA.").

1    that Plaintiffs' negligence claims, premised, among other things, on allegations that

2    the NFL failed "to ensure accurate diagnosis and recording of concussive brain

3    injury so the condition can be treated in an adequate and timely manner," were

4    preempted because "[t]he physician provisions of the CBA must be taken into

5    account in determining the degree of care owed by the NFL and how it relates to

6    the NFL's alleged failure to establish guidelines or policies to protect the mental

7    health and safety of its players." *Maxwell*, Order at 2; *Pear*, Order at 2; *Barnes*,

8    Order at 2; *see also Duerson*, 2012 WL 1658353, at *4 ("A court could plausibly

9    interpret those provisions to impose a duty on the NFL's clubs to monitor a player's

10   health and fitness to continue to play football . . . . The NFL could then reasonably

11   exercise a lower standard of care in that area itself. Determining the meaning of the

12   CBA provisions is thus necessary to resolve Duerson's negligence claim.").

13   Having determined that at least one federal claim was present, this Court exercised

14   supplemental jurisdiction over the remaining claims. *Maxwell*, Order at 2; *Pear*,

15   Order at 2; *Barnes*, Order at 2; *see also Duerson*, 2012 WL 1658353, at *6.

16          11.    Plaintiffs' claims also are preempted by section 301 because the

17   purported duties Plaintiffs allege the NFL Defendants had and breached were

18   created by the CBAs and are not based on an independent duty "owed to every

19   person in society." *See United Steelworkers of Am.* v. *Rawson*, 495 U.S. 362, 370-

20   71, 110 S. Ct. 1904, 1910, 109 L. Ed. 2d 362 (1990) (holding in the context of a

21   labor dispute involving unionized employees that, absent an independent duty

22   running from defendants "to every person in society," any such duty to plaintiffs

23   must arise out of the CBA); *see also Adkins* v. *Mireles*, 526 F.3d 531, 540-41 (9th

24   Cir. 2008) (holding that plaintiffs' negligent misrepresentation claim was

25   preempted because plaintiffs "failed to show a separate, independent duty upon

26   which to base this claim"). Plaintiffs' claims hinge fundamentally on the NFL's

27   purported failure to implement adequate rules, regulations, and guidelines regarding

28   health and safety. (*See, e.g.*, Compl. ¶ 83.) The CBAs, however, establish the duty

1    of the NFL and its member clubs to implement and enforce rules regarding

2    professional football. *See, e.g.*, NFL CBA Art. XI § 9 (1982-87), Art. XIII § 1(b)-

3    (c) (1993-2010), Art. XIII § 1(c) (2002-10) (mandating procedures for review,

4    investigation and resolution of disputes involving proposed rule changes that

5    "would adversely affect player safety"); Art. XI § 8 (1982-87), Art. XIII § 2 (1993-

6    2010) (inviting player representatives to the Competition Committee meetings "to

7    represent the players' viewpoint on rules"); NFL Constitution, Art. XI, § 11.2

8    (1984, 1999) (delegating to the NFL, and their member clubs, the obligation to

9    "amend[] or change[]" all "[p]laying rules," and further requiring that all proposed

10   rule changes be presented to the NFL prior to a vote).

11          12.    Even though Plaintiffs are retired, Plaintiffs' claims are

12   premised on alleged conduct occurring at the time that they played NFL football.

13   (*See, e.g.*, Compl. ¶ 655 ("NFL Defendants breached its duty to ensure that the

14   equipment it licensed and approved were of the highest possible quality and

15   sufficient to protect the NFL players, including Plaintiffs, from the risk of

16   concussive brain injuries.").)   Therefore, to resolve Plaintiffs' claims, the Court

17   will need to interpret provisions of the CBAs that were operative during portions of

18   Plaintiffs' NFL careers to resolve those claims. *See Duerson*, 2012 WL 1658353,

19   at *3 ("To prove the complaint's claims, Duerson must show that the CTE from

20   which Duerson suffered was caused by repeated blows to the head during his time

21   as an NFL player."); *see also Mendes* v. *W.M. Lyles Co.*, No. CIV F 07-1265, 2008

22   WL 171003, at *10 (E.D. Cal. Jan. 18, 2008) (dismissing plaintiff's underpayment

23   claims for failure to exhaust grievance remedies contained in an expired collective

24   bargaining agreement that was operative during the time the alleged underpayment

25   took place); *Cameron* v. *Idearc Media Corp.*, No. 08-12010, 2009 WL 2496439, at

26   *6 (D. Mass. Aug. 13, 2009) (finding section 301 preemption of tortious

27   interference claim brought after expiration of CBA when claim related to

28   termination of employment prior to expiration).

III.   **REMOVAL IS PROCEDURALLY PROPER**

13.   The Central District of California is the federal district in which the Superior Court of the State of California, County of Los Angeles—where Plaintiffs filed their Complaint—is located.

14.   This Notice of Removal is timely under 28 U.S.C. § 1446(b), which states that "notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based."

15.   Written notice of the filing of this Notice of Removal will be provided to Plaintiffs, and a copy of this Notice will be filed in the appropriate state court, as required by 28 U.S.C. § 1446(d).  This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.  *See* 28 U.S.C. § 1446(a).

16.   Counsel for the Riddell Defendants has consented to the removal of the action.  All defendants thus have consented to removal of the action.  *See Parrino* v. *FHP, Inc.*, 146 F.3d 699, 703 (9th Cir. 1998) ("All defendants must join a notice of removal.").

17.   In filing this Notice of Removal, the NFL Defendants do not waive any defenses that may be available to them, including without limitation jurisdiction, venue, standing, or procedures for the disposition of this action in accordance with the terms of the CBA.  Nor do the NFL Defendants admit any of the factual allegations in the Complaint; they expressly reserve the right to contest those allegations at the appropriate time.

/ / /

/ / /

/ / /

/ / /

/ / /

1    WHEREFORE, the NFL Defendants remove the above-captioned

2  action brought against them in the Superior Court of the State of California, Los

3  Angeles County.

4  DATED: November ___, 2012    MUNGER, TOLLES & OLSON LLP

5

6                               By: _____

7                                     JOHN W. SPIEGEL

8                               -and-

9                               PAUL, WEISS, RIFKIND, WHARTON &
                                GARRISON LLP
10

11                              Attorneys for Defendants
                                NATIONAL FOOTBALL LEAGUE
12                              and NFL PROPERTIES LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF REMOVAL OF CIVIL
ACTION UNDER 28 U.S.C. § 1441

# EXHIBIT A

Los Angeles Superior Court - Civil Case Summary                    Page 1 of 5

## Case Summary

Please make a note of the Case Number.

Click here to access document images for this case.
If this link fails, you may go to the Case Document Images site and search using
the case number displayed on this page.

**Case Number:** BC494568
JOSEPH SWEET ET AL VS NATIONAL FOOTBALL LEAGUE ET AL

**Filing Date:** 10/25/2012
**Case Type:** Prdct Liablty (not asbes,tox,envir (General Jurisdiction)
**Status:** Pending

---

### Future Hearings

**12/21/2012** at 08:30 am in department 69 at 111 North Hill Street, Los Angeles,
CA 90012
OSC-Failure to File Proof of Serv

**02/25/2013** at 08:31 am in department 69 at 111 North Hill Street, Los Angeles,
CA 90012
Conference-Case Management

---

Documents Filed   ☐Proceeding Information

### Parties

Click on any of the below link(s) to see names that begin with the letter indicated:
A - D    E - L    M - R    S - W

ALFORD MICHAEL - Plaintiff/Petitioner

ALL AMERICAN SPORTS CORPORATION - Defendant/Respondent

ANDERSON DEON - Plaintiff/Petitioner

BALDASSIN MARRY - Plaintiff/Petitioner

BALDASSIN MICHAEL R. - Plaintiff/Petitioner

BANKS ANTHONY - Plaintiff/Petitioner

BATES LARRY - Plaintiff/Petitioner

BEATTY CHARLES - Plaintiff/Petitioner

BELL EDWARD - Plaintiff/Petitioner

Los Angeles Superior Court - Civil Case Summary

BLACKWELL SAMUEL - Plaintiff/Petitioner

BOUIE ALLISON - Plaintiff/Petitioner

BOUIE TONY - Plaintiff/Petitioner

BUTLER JERAMETRIUS - Plaintiff/Petitioner

CHRISTENSON BRANDON - Plaintiff/Petitioner

COLLINS JR. ROOSEVELT - Plaintiff/Petitioner

CORKER JOHN - Plaintiff/Petitioner

CROSS ELIZABETH - Plaintiff/Petitioner

CROSS IRV - Plaintiff/Petitioner

CURTIS ANTHONY - Plaintiff/Petitioner

DAVIS RONALD - Plaintiff/Petitioner

DEVAUGHN DENNIS - Plaintiff/Petitioner

Click on any of the below link(s) to see names that begin with the letter indicated:
TOP   A - D   E - L   M - R   S - W

EASTON-BELL SPORTS INC. - Defendant/Respondent

EASTON-BELL SPORTS LLC - Defendant/Respondent

EB SPORTS CORP. - Defendant/Respondent

EDWARDS LARRY - Plaintiff/Petitioner

FARMER II ROBERT - Plaintiff/Petitioner

FARRIS JOHN - Plaintiff/Petitioner

FITZSIMMONS CASEY - Plaintiff/Petitioner

FLATLEY PAUL - Plaintiff/Petitioner

GIBSON REUBEN - Plaintiff/Petitioner

GIRARDI ☐KEESE - Attorney for Plaintiff/Petitioner

GOLDBERG PERSKY ☐ WHITE P.C. - Attorney for Plaintiff/Petitioner

GRAYSON JR. DAVID L. - Plaintiff/Petitioner

HARDMAN CEDRICK - Plaintiff/Petitioner

**EX A, PAGE 13**

Los Angeles Superior Court - Civil Case Summary                    Page 3 of 5

HARRIS BERNARDO - Plaintiff/Petitioner

HOOVER MELVIN - Plaintiff/Petitioner

JOHN DOES 1 THROUGH 100 INCLUSIVE - Defendant/Respondent

KENNEY STEVEN - Plaintiff/Petitioner

LITTLE EVERETT - Plaintiff/Petitioner

LONG DOUG - Plaintiff/Petitioner

LONG KRISTIE - Plaintiff/Petitioner

Click on any of the below link(s) to see names that begin with the letter indicated:
TOP   A - D   E - L   M - R   S - W

MALLORY LARRY - Plaintiff/Petitioner

MATTOX MARVIN - Plaintiff/Petitioner

MAYFIELD COREY - Plaintiff/Petitioner

MCCOY VINCENT - Plaintiff/Petitioner

MCKIBBEN MICHAEL - Plaintiff/Petitioner

MCKIBBEN RANDI - Plaintiff/Petitioner

MCNORTON BRUCE - Plaintiff/Petitioner

MICKENS WILLIAM RAY - Plaintiff/Petitioner

MILKS JOHN - Plaintiff/Petitioner

MITCHEL ERIC - Plaintiff/Petitioner

MOSEBAR DONALD - Plaintiff/Petitioner

NATIONAL FOOTBALL LEAGUE - Defendant/Respondent

NFL PROPERTIES LLC - Defendant/Respondent

OVERTON JERRY - Plaintiff/Petitioner

PRESIDENT ANDRE - Plaintiff/Petitioner

RBG HOLDINGS CORP. - Defendant/Respondent

REMBERT REGGIE - Plaintiff/Petitioner

RICHARDS DAVID - Plaintiff/Petitioner

**EX A, PAGE 14**

Los Angeles Superior Court - Civil Case Summary                    Page 4 of 5

RIDDELL INC. - Defendant/Respondent

RIDDELL SPORTS GROUP INC. - Defendant/Respondent's DBA

RIDDELL SPORTS GROUP INC. - Defendant/Respondent

RIDDELL/ALL AMERICAN - Defendant/Respondent's DBA

ROBERTSON ISIAH - Plaintiff/Petitioner

RUSSOMANNO ☐BORRELLO P.A. - Attorney for Plaintiff/Petitioner

Click on any of the below link(s) to see names that begin with the letter indicated:
TOP   A - D   E - L   M - R   S - W

SAMPSON RALPH GREGORY - Plaintiff/Petitioner

SEVERSON JEFFREY - Plaintiff/Petitioner

SMEDLEY ERIC - Plaintiff/Petitioner

SMITH DAVID - Plaintiff/Petitioner

SMITH DONNELL - Plaintiff/Petitioner

SMITH RON - Plaintiff/Petitioner

STAFFORD RICHARD - Plaintiff/Petitioner

STANLEY BENJAMIN - Plaintiff/Petitioner

STOCKEMER RALPH - Plaintiff/Petitioner

SWEET JOSEPH - Plaintiff/Petitioner

SWEET M. STORME - Plaintiff/Petitioner

TURNER GREG - Plaintiff/Petitioner

TURNER RHONDA - Plaintiff/Petitioner

VAN DRUTEN RICHARD - Plaintiff/Petitioner

WATKINS JUNIOR BOBBY - Plaintiff/Petitioner

WEATHERSPOON CEPHUS - Plaintiff/Petitioner

WILLIAMS DELVIN - Plaintiff/Petitioner

WILLIAMS MIKELL - Plaintiff/Petitioner

WILLIAMS WALTER - Plaintiff/Petitioner

**EX A, PAGE 15**

Los Angeles Superior Court - Civil Case Summary                    Page 5 of 5

WRIGHT WILLIAM KEITH - Plaintiff/Petitioner

Click on any of the below link(s) to see names that begin with the letter indicated:
TOP   A - D   E - L   M - R   S - W

---

Case Information  ☐Party Information  ☐Proceeding Information

Please make a note of the Case Number.

Click here to access document images for this case.
If this link fails, you may go to the Case Document Images site and search using
the case number displayed on this page.

**Documents Filed** (Filing dates listed in descending order)

**11/16/2012** Proof of Service
Filed by Attorney for Plaintiff/Petitioner

**11/06/2012** Proof of Service
Filed by Attorney for Plaintiff/Petitioner

**11/02/2012** Proof of Service
Filed by Attorney for Plaintiff/Petitioner

**10/31/2012** Proof of Service
Filed by Attorney for Plaintiff/Petitioner

**10/30/2012** OSC-Failure to File Proof of Serv
Filed by Clerk

**10/30/2012** Notice-Case Management Conference
Filed by Clerk

**10/25/2012** Complaint

**10/25/2012** Notice-Related Cases
Filed by Attorney for Plaintiff/Petitioner

---

Case Information  ☐Party Information  ☐Documents Filed

**Proceedings Held** (Proceeding dates listed in descending order)
None

---

Case Information  ☐Party Information  ☐Documents Filed  ☐Proceeding Information

 CT Corporation

**Service of Process
Transmittal**
11/01/2012
CT Log Number 521527981

**TO:**   Madison Team
CTProComply (Recipient Account Only)
8040 Excelsior Drive, Suite 200
Madison, WI 53717

**RE:**   **Process Served in Delaware**

**FOR:**   NFL Properties LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Joseph Sweet, et al., Pltfs. vs. National Football League, et al. including NFL Properties LLC, Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Instructions, Cover Sheet, Addendum and Statement of Location, Notice(s), Attachment, ADR Information Packet(s), Informal Discovery Conference, Complaint and Jury Demand |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Central District, CA
Case # BC494568 |
| **NATURE OF ACTION:** | The NFL knowingly and fraudently concealed from NFL players and former NFL players the risks of head injuries, in particular the heightened risk created by returning to the playing field before a proper recovery from their head injuries |
| **ON WHOM PROCESS WAS SERVED:** | CTProComply Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/01/2012 at 15:15 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Thomas V. Girardi
Girardi Keese
1126 Wilshire Boulevard
Los Angeles, CA 90017
213-977-0211 |
| **REMARKS:** | Document underlined to indicate intended entity |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/01/2012, Expected Purge Date: 11/06/2012
Image SOP
Email Notification, Madison Team ctsop@ctprocomply.com |
| **SIGNED:**
**PER:**
**ADDRESS:**

**TELEPHONE:** | CTProComply Company
Scott LaScala
1209 Orange Street
Wilmington, DE 19801
302-658-7581 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**EX A, PAGE 17**

**SUMMONS**
*(CITACION JUDICIAL)*

SUM-100

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

OCT 25 2012

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
SHAUNYA WESLEY

**NOTICE TO DEFENDANT:** NATIONAL FOOTBALL LEAGUE; NFL
*(AVISO AL DEMANDADO):* PROPERTIES LLC; RIDDELL, INC.
d/b/a RIDDELL SPORTS GROUP, INC., ALL AMERICAN SPORTS
CORPORATION, d/b/a RIDDELL/ALL AMERICAN; RIDDELL
SPORTS GROUP, INC., EASTON-BELL SPORTS, INC.; EASTON-
BELL SPORTS, LLC; EB SPORTS CORP.; and RBG HOLDINGS
CORP.; and JOHN DOES 1 through 100, Inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOSEPH SWEET, ét al.

**(Additional Parties Attachment form is attached)**

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* |
|---|---|
| Los Angeles Superior Court Central District 111 N. Hill Street Los Angeles, CA 90017 | BC494568 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Thomas V. Girardi, SBN: 36603          (213) 977-021
GIRARDI | KEESE
1126 Wilshire Blvd.
Los Angeles, CA 90017

DATE: _____ OCT 25 2012          Clerk, by _____, Deputy
*(Fecha)*                              *(Secretario)*          *(Adjunto)*

*JOHN A. CLARKE*          *Shaunya Wesley*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* NFL Properties, LLC

   under:  ☐ CCP 416.10 (corporation)            ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
           ☒ other *(specify):* limited liability company
4. ☒ by personal delivery on *(date):* 11\12          Page 1 of 1

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

**EX A, PAGE 18**

| | SUM-200(A) |
|---|---|
| SHORT TITLE:  JOSEPH SWEET, et al. v. NFL, et al. | CASE NUMBER: |

### INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

[x] Plaintiff   [ ] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

M. STORME SWEET, his wife; MICHAEL R. BALDASSIN and MARY BALDASSIN, his wife;
TONY BOUIE and ALLISON BOUIE, his wife; IRV CROSS and ELIZABETH CROSS, his wife;
LARRY EDWARDS; PAUL FLATLEY; DAVID L. GRAYSON, JR.; MELVIN HOOVER; KRISTIE LONG,
Administratrix of the Estate of DOUG LONG, DECEASED; MARVIN MATTOX; MICHAEL
McKIBBEN and RANDI McKIBBEN, his wife; BRUCE McNORTON; REGGIE REMBERT; GREG
TURNER and RHONDA TURNER, his wife; DELVIN WILLIAMS; STEVEN KENNEY; RALPH
GREGORY SAMPSON; ERIC SMEDLEY; BENJAMIN STANLEY; CASEY FITZSIMMONS; JOHN FARRIS;
CHARLES BEATTY; EDWARD BELL; SAMUEL BLACKWELL; JERAMETRIUS BUTLER; ROOSEVELT
COLLINS JR.; DENNIS DEVAUGHN; ROBERT FARMER II; CEDRICK HARDMAN; LARRY MALLORY;
COREY MAYFIELD; VINCENT McCOY; ERIC MITCHEL; JERRY OVERTON; ISIAH ROBERTSON;
DAVID SMITH; RALPH STOCKEMER; BOBBY WATKINS JUNIOR; MIKELL WILLIAMS; JEFFREY
SEVERSON; EVERETT LITTLE; BERNARDO HARRIS; ANTHONY BANKS; ANTHONY CURTIS; RONALD
DAVIS; JOHN MILKS; JOHN CORKER; WILLIAM RAY MICKENS; BRANDON CHRISTENSON;
MICHAEL ALFORD; REUBEN GIBSON; LARRY BATES; DONALD MOSEBAR; RICHARD VAN DRUTEN;
DAVID RICHARDS; WILLIAM KEITH WRIGHT; WALTER WILLIAMS; CEPHUS WEATHERSPOON;
ANDRE PRESIDENT; RON SMITH; DEON ANDERSON; DONNELL SMITH; RICHARD STAFFORD,

Page 1 of 1
Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons



EX A, PAGE 19

```
 1   GIRARDI | KEESE
     THOMAS V. GIRARDI, Bar No. 36603
 2   1126 Wilshire Boulevard
 3   Los Angeles, California 90017
     Telephone: (213) 977-0211
 4   Facsimile: (213) 481-1554
 5
     RUSSOMANNO & BORRELLO, P.A.
 6   Herman Russomanno, (Florida Bar No. 240346) Pro Hac Vice Application Forthcoming
 7   Robert Borrello, (Florida Bar No. 764485) Pro Hac Vice Application Forthcoming
     150 West Flagler Street - PH 2800
 8   Miami, FL 33130
 9   Telephone: (305) 373-2101
     Facsimile: (305) 373-2103
10
11   GOLDBERG, PERSKY & WHITE, P.C.
     Jason E. Luckasevic, (Pennsylvania Bar No. 85557) Pro Hac Vice Application Forthcoming
12   1030 Fifth Ave.
13   Pittsburgh, PA 15219
     Telephone: (412) 471-3980
14   Facsimile: (412) 471-8308                         BC494568
15
     Attorneys for Plaintiffs
16
17              SUPERIOR COURT OF THE STATE OF CALIFORNIA
18                        COUNTY OF LOS ANGELES
19
     JOSEPH SWEET and M. STORME SWEET, his  )   Case No.
20   wife; MICHAEL R. BALDASSIN and MARY    )
21   BALDASSIN, his wife; TONY BOUIE and    )
     ALLISON BOUIE, his wife; IRV CROSS and )
22   ELIZABETH CROSS, his wife; LARRY       )   COMPLAINT FOR DAMAGES
     EDWARDS; PAUL FLATLEY; DAVID L.        )
23   GRAYSON, JR.; MELVIN HOOVER; KRISTIE   )
24   LONG, Administratrix of the Estate of DOUG )  DEMAND FOR JURY TRIAL
     LONG, DECEASED; MARVIN MATTOX;         )
25   MICHAEL McKIBBEN and RANDI McKIBBEN,)
     his wife; BRUCE McNORTON; REGGIE       )
26   REMBERT; GREG TURNER and RHONDA        )
     TURNER, his wife; DELVIN WILLIAMS;     )
27   STEVEN KENNEY; RALPH GREGORY           )
28
                              -1-

                      COMPLAINT FOR DAMAGES
```

**EX A, PAGE 20**

1  SAMPSON; ERIC SMEDLEY; BENJAMIN          )
2  STANLEY; CASEY FITZSIMMONS; JOHN         )
   FARRIS; CHARLES BEATTY; EDWARD           )
3  BELL; SAMUEL BLACKWELL;                  )
   JERAMETRIUS BUTLER; ROOSEVELT            )
4  COLLINS JR.; DENNIS DEVAUGHN; ROBERT )
   FARMER II; CEDRICK HARDMAN; LARRY        )
5  MALLORY; COREY MAYFIELD; VINCENT         )
   McCOY; ERIC MITCHEL; JERRY OVERTON;      )
6  ISIAH ROBERTSON; DAVID SMITH; RALPH      )
   STOCKEMER; BOBBY WATKINS JUNIOR;         )
7  MIKELL WILLIAMS; JEFFREY SEVERSON;       )
8  EVERETT LITTLE; BERNARDO HARRIS;         )
   ANTHONY BANKS; ANTHONY CURTIS;           )
9  RONALD DAVIS; JOHN MILKS; JOHN           )
   CORKER; WILLIAM RAY MICKENS;             )
10 BRANDON CHRISTENSON; MICHAEL             )
11 ALFORD; REUBEN GIBSON; LARRY BATES; )
   DONALD MOSEBAR; RICHARD VAN              )
12 DRUTEN; DAVID RICHARDS; WILLIAM          )
   KEITH WRIGHT; WALTER WILLIAMS;           )
13 CEPHUS WEATHERSPOON; ANDRE               )
14 PRESIDENT; RON SMITH; DEON               )
   ANDERSON; DONNELL SMITH; RICHARD         )
15 STAFFORD,                                )
                                            )
16                Plaintiffs,               )
                                            )
17                                          )
   v.                                       )
18                                          )
19 NATIONAL FOOTBALL LEAGUE; NFL            )
   PROPERTIES LLC; RIDDELL, INC. d/b/a      )
20 RIDDELL SPORTS GROUP, INC.; ALL          )
   AMERICAN SPORTS CORPORATION, d/b/a       )
21 RIDDELL/ALL AMERICAN; RIDDELL            )
   SPORTS GROUP, INC., EASTON-BELL          )
22 SPORTS, INC.; EASTON-BELL SPORTS, LLC;   )
23 EB SPORTS CORP.; and RBG HOLDINGS        )
   CORP.; and JOHN DOES 1 through 100,      )
24 Inclusive,                               )
                                            )
25                Defendants.               )
26                                          )
27

28                              -2-

─────────────────────────────────────────

                COMPLAINT FOR DAMAGES

The Plaintiffs, all individuals, hereby complain of Defendants listed above and hereby allege as follows:

**PARTIES**

**Plaintiffs:**

1.   Mr. Joseph Sweet and his wife, M. Stormé, are residents of and domiciled in the State of California.

2.   Mr. Michael R. Baldassin and his wife, Mary Baldassin, are residents of an domiciled in the State of Washington.

3.   Mr. Tony Bouie and his wife, Allison, are residents of and domiciled in the State of Arizona.

4.   Mr. Irv Cross and his wife, Elizabeth, are residents of and domiciled in the State of Minnesota.

5.   Mr. Larry Edwards is a resident of and domiciled in the State of Texas.

6.   Mr. Paul Flatley is a resident of and domiciled in the State of Indiana.

7.   Mr. David L. Grayson, Sr. is a resident of and domiciled in the State of California.

8.   Mr. Melvin Hoover is a resident of and domiciled in the State of North Carolina.

9.   Mrs. Kristie Long, Administratrix of the Estate of Doug Long, is a resident of and domiciled in the State of Washington.

10.   Mr. Marvin Mattox is a resident of and domiciled it the State of Oklahoma.

11.   Mr. Michael McKibben and his wife, Randi, are residents of and domiciled it the State of Pennsylvania.

12.   Mr. Bruce McNorton is a resident of and domiciled in the State of Florida.

13.   Mr. Reggie Rembert is a resident of and domiciled in the State of Indianapolis.

///

-3-

COMPLAINT FOR DAMAGES

14.   Mr. Greg Turner and his wife, Rhonda, are residents of and domiciled in the State of Arizona.

15.   Mr. Delvin Williams is a resident of and domiciled in the State of California.

16.   Mr. Steven Kenney is a resident of and domiciled in the State of North Carolina.

17.   Mr. Ralph Gregory Sampson is a resident of and domiciled in the State of California.

18.   Mr. Eric Smedley is a resident of and domiciled in the Province of Saskatchewan, Canada.

19.   Mr. Benjamin Stanley is a resident of and domiciled in the State of Texas.

20.   Mr. Casey Fitzsimmons is a resident of and domiciled in the State of Montana.

21.   Mr. John Farris is a resident of and domiciled in the State of California.

22.   Mr. Charles Beatty is a resident of and domiciled in the State of Texas.

23.   Mr. Edward Bell is a resident of and domiciled in the State of Texas.

24.   Mr. Samuel Blackwell is a resident of and domiciled in the State of Virginia.

25.   Mr. Jerametrius Butler, Senior is a resident of and domiciled in the State of Texas.

26.   Mr. Roosevelt Collins Jr. is a resident of and domiciled in the State of Texas.

27.   Mr. Dennis DeVaughn is a resident of and domiciled in the State of Texas.

28.   Mr. Robert Farmer II is a resident of and domiciled in the State of North Carolina.

29.   Mr. Cedrick Hardman is a resident of and domiciled in the State of California.

30.   Mr. Larry Mallory is a resident of and domiciled in the State of Texas.

31.   Mr. Corey Mayfield is a resident of and domiciled in the State of Texas.

32.   Mr. Vincent McCoy is a resident of and domiciled in the State of Florida.

33.   Mr. Eric Mitchel is a resident of and domiciled in the State of Texas.

34.   Mr. Jerry Overton is a resident of and domiciled in the State of Texas.

35.   Mr. Isiah Robertson is a resident of and domiciled in the State of Texas.

-4-

COMPLAINT FOR DAMAGES

**EX A, PAGE 23**

36. Mr. David Smith is a resident of and domiciled in the State of Texas.

37. Mr. Ralph Stockemer is a resident of and domiciled in the State of Texas.

38. Mr. Bobby Watkins Junior is a resident of and domiciled in the State of Texas.

39. Mr. Mikell Williams is a resident of and domiciled in the State of Louisiana.

40. Mr. Jeffrey Severson is a resident of and domiciled in the State of California.

41. Mr. Everett Little is a resident of and domiciled in the State of Texas.

42. Mr. Bernardo Harris is a resident of and domiciled in the State of North Carolina.

43. Mr. Anthony Banks is a resident of and domiciled in the State of Texas.

44. Mr. Anthony Curtis is a resident of and domiciled in the State of Texas.

45. Mr. Ronald Davis is a resident of and domiciled in the State of Arkansas.

46. Mr. John Milks is a resident of and domiciled in the State of California

47. Mr. John Corker is a resident of and domiciled in the State of Texas.

48. Mr. William Ray Mickens is a resident of and domiciled in the State of Texas.

49. Mr. Brandon Christenson is a resident of and domiciled in the State of Oklahoma.

50. Mr. Michael Alford is a resident of and domiciled in the State of Alabama.

51. Mr. Reuben Gibson is a resident of and domiciled in the State of Georgia.

52. Mr. Larry Bates is a resident of and domiciled in the State of California.

53. Mr. Donald Mosebar is a resident of and domiciled in the State of California.

54. Mr. Richard Van Druten is a resident of and domiciled in the State of Texas.

55. Mr. David Richards is a resident of and domiciled in the State of Texas

56. Mr. William Keith Wright is a resident of and domiciled in the State of Texas

57. Mr. Walter Williams is a resident of and domiciled in the State of Texas

58. Mr. Cephus Weatherspoon is a resident of and domiciled in the State of California

-5-

COMPLAINT FOR DAMAGES

**EX A, PAGE 24**

59. Mr. Andre President is a resident of and domiciled in the State of Texas

60. Mr. Ron Smith is a resident of and domiciled in the State of Utah

61. Mr. Deon Anderson is a resident of and domiciled in the State of Florida

62. Mr. Donnell Smith is a resident of and domiciled in the State of California

63. Mr. Richard Stafford is a resident of and domiciled in the State of Texas

**Defendants:**

64. Defendant National Football League ("the NFL") is an unincorporated association with its headquarters located in the State of New York. The NFL regularly conducts business in California.

65. Defendant NFL Properties, LLC as the successor-in-interest to National Football League Properties Inc. ("NFL Properties") is a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York. NFL Properties is engaged, among other activities, approving licensing and promoting equipment used by all the NFL teams. NFL Properties regularly conducts business in California.

66. Defendant Riddell, Inc. (d/b/a Riddell Sports Group, Inc.) is a corporation organized and existing under the laws of the State of Illinois, and is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL and since 1989 has been the official helmet of the NFL. Riddell, Inc. regularly conducts business in California.

67. Defendant All American Sports Corporation, d/b/a Riddell/All American, is a corporation organized and existing under the laws of the State of Delaware and is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL and since 1989 has been the official helmet of the NFL. All American Sports regularly conducts business in California.

///

///

-6-

COMPLAINT FOR DAMAGES

68.   Defendant Riddell Sports Group, Inc. is a Delaware corporation with its principal place of business at 6255 N. State Highway, #300, Irving, Texas 76038.   Riddell Sports Group, Inc. regularly conducts business in California.

69.   Defendant Easton-Bell Sports, Inc. is a Delaware Corporation with a principal place of business at 7855 Haskell Avenue, Suite 200, Van Nuys, California 91406 and is a parent corporation of Riddell Sports Group Inc.   Easton-Bell Sports, Inc. designs, develops, and markets branded athletic equipment and accessories, including marketing and licensing products under the Riddell brand.   Easton-Bell Sports, Inc. regularly conducts business in California.

70.   Defendant Easton-Bell Sports, LLC is the parent corporation of Easton-Bell Sports, Inc. and is incorporated in Delaware, with a principal place of business at 152 West 57th Street, New York, New York 10019. Easton-Bell Sports, LLC regularly conducts business in California.

71.   Defendant EB Sports Corp. is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Van Nuys, California 91406.   EB Sports Corp. regularly conducts business in California.

72.   Defendant RBG Holdings Corp. is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Suite 350, Van Nuys, California 91406.   RBG Holdings Corp. regularly conducts business in California.

73.   Defendants Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton-Bell Sports, LLC, and RBG Holdings Corp., shall hereinafter be referred to collectively as "Riddell" or the "Riddell Defendants."

## JURISDICTION AND VENUE

74.   Jurisdiction is based upon the California Constitution Article 6, Section 10.

///

-7-

COMPLAINT FOR DAMAGES

75.    Venue is proper in this Court pursuant to Section 395(A) of the California Code of Civil Procedure.

## INTRODUCTION

76.    This case seeks a declaration of liability and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses suffered by the Plaintiffs and Plaintiffs' Spouses as a result of the NFL's intentional tortious misconduct (by its gratuitous, voluntary undertaking), negligence, and fraud.

77.    This action arises from the pathological and debilitating effects of mild traumatic brain injuries, caused by concussive and sub-concussive impacts (referenced herein as "MTBI") that have afflicted former professional football players in the National Football League. For many decades, evidence has linked repetitive MTBI to long-term neurological problems in many sports, including football.

78.    The NFL, as the organizer, marketer, and face of the most popular sport in the United States, in which MTBI is a regular occurrence and/or players have been at risk for MTBI, was aware of the evidence and the risks associated with repetitive traumatic brain injuries for decades, but deliberately ignored and used its monopoly power to actively concealed the information from the Plaintiffs and all others who participated in organized football at all levels.

79.    The NFL has actively concealed and actively disputed any correlation between on the field MTBI and the chronic mental illnesses and maladies suffered by former players, including the Plaintiffs and all others similarly situated.

80.    For many years, the NFL learned that many football players had developed chronic severe headaches, malaise, intolerance of loud noises, depression and emotional labiality as a consequence of multiple "dings," sub-concussive events and concussions.

-8-

COMPLAINT FOR DAMAGES

81.   Moreover, in or around 1994 and possibly earlier, the NFL gratuitously and voluntarily inserted itself into the scientific research and discussion concerning the relationship between the head trauma NFL players are exposed to in practices and game play and short-term and long-term impairment of the brain.  The NFL's investigation of this serious medical concern conflicted radically with its continuing promotion of the violence of the sport.

82.   During the past several decades, the NFL intentionally and fraudulently misled then-active and former players and their families regarding its purported expertise in studying MTBI regarding the short-term and long-term risks posed by concussions and head trauma.

83.   After acknowledging its long-standing duty to investigate, study, and report about the risks of MTBI in the sport of football, the NFL failed to provide reasonably developed instructions and warnings regarding the risks of chronic permanent brain injury sequelae, and instead produced industry-funded, biased research and advocacy that actively deceived players and misrepresented that concussions and sub-concussive head impacts did not present serious, life-altering risks.

84.   The NFL has actively, continuously and vehemently denied any correlation between participation as a player in the NFL and cognitive neurological symptoms and problems such as headaches, dizziness, loss of memory, dementia and ALS by way of gratuitous press releases, funded and/or sponsored publications in the scientific literature and communications intended to mislead and misinform.

85.   The NFL, through its own initiative and voluntary undertaking, created and/or decided to fund the so-called Mild Traumatic Brain Injury Committee (the "MTBI Committee") in 1994 to ostensibly research and study MTBI affecting NFL players.  Notwithstanding this purported purpose, and despite clear medical evidence that on-field sub-concussive and concussive events can produce MTBI with tragic results, the NFL failed to inform its current and former players of the true risk and purposefully misrepresented and/or concealed medical evidence on that issue.

-9-

COMPLAINT FOR DAMAGES

86.     The NFL's active and purposeful concealment and misrepresentation of the severe neurological risks of repetitive MTBI exposed players to dangers they could have avoided had the NFL provided them with truthful and accurate information.   Many of these players have MTBI and latent neurodegenerative disorders and diseases as a result of the NFL's acts and/or omissions.

87.     The NFL has, over the past four decades, actively concealed and disputed any correlation between on the field sub-concussive and concussive events, its return to play policies and the chronic neuro-cognitive damage, illnesses and decline suffered by former players, including the Plaintiffs and all others similarly situated.   Further, during the decades of the 1990s and 2000s, the NFL through its authorized agents disputed and actively sought to suppress the findings of others that there is a connection between on-field MTBI and post-career neuro-cognitive damage, illness and decline.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS AGAINST THE NFL

88.     The NFL generates approximately $9,300,000,000.00 in gross income per year.

89.     The organization oversees America's most popular spectator sport, acting as a trade association for the benefit of the thirty-two independently operated Teams.

90.     The NFL governs and promotes the game of football, sets and enforces rules and League policies, and regulates team ownership.

91.     The NFL generates revenue mostly through marketing sponsorships, licensing merchandise, and by selling national broadcasting rights to the games.   The Teams share a percentage of the League's overall revenue.

92.     The NFL enjoys partial monopoly power through an anti-trust exemption granted via the federal Sports Broadcasting Act that allows the NFL to sell television rights for all 32 teams as a single unit.

///

-10-

COMPLAINT FOR DAMAGES

**EX A, PAGE 29**

**The NFL's Influence**

93.     In part because of its financial power, monopoly status, and high visibility, the NFL has enormous influence over the game of football at all levels of the game.   The NFL has previously been judicially determined to be a monopolist.   *United States Football League v. National Football League*, 644 F. Supp 1040, 1042 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2nd Cir. 1989).

94.     Over many decades, the NFL's influence has been expanded through its use of the media. Through NFL films, the NFL Network, and www.NFL.com, the NFL has promoted NFL football via every mass communication medium available.

**The NFL Has Mythologized Violence Through the Media**

95.     Part of the NFL's strategy to promote NFL football is: (a) to mythologize players and Teams; (b) to glorify the accomplishments of individuals and Teams; and (c) to glorify the brutality and ferocity of NFL football, by lauding and mythologizing the most brutal and ferocious players and collisions and simultaneously propagating the fraudulent representation that "getting your bell rung," "being dinged" and putting big hits on others is not seriously hazardous to one's health.

96.     As a result of the NFL's strategy of glorifying the brutality and ferocity of NFL football, the NFL has propagated the false myth that collisions of all kinds, including brutal and ferocious collisions, many of which lead to short-term and long-term neurological damage to current and former NFL players, are an acceptable, desired, and natural consequence of the game, and a measure of the courage and heroism of those involved in football at every level of the game.

97.     As a result of this strategy, and the overwhelming influence of the NFL at every level of the game, the NFL has generated for itself and others billions of dollars every year by promoting a product of brutality and ferocity and inculcating in players at every level of the game the false and life-threatening ideas that (a) brutal, ferocious, and debilitating collisions are a required and desired outcome in the game of

-11-

COMPLAINT FOR DAMAGES

football; and (b) returning to play despite sustaining repetitive head impacts is a laudable and desirable goal.

### The NFL Markets and Glorifies Football's Violence Through NFL Films

98.     NFL Films is an NFL owned company devoted to producing promotional films for the NFL.  One television critic described NFL Films as "the greatest in-house P.R. machine in pro sports history… an outfit that could make even a tedious stalemate seem as momentous as the battle for the Alamo."

99.     NFL Films is known for the style it features in all of its productions, capturing the NFL games, plays, players, and overall NFL environment in an artistic, promotional fashion.  NFL Films cinematography is intended to create compelling storylines and highlight certain aspects of the game.  NFL Films takes viewers right into the football action with close-ups and slow motion capture of all the hard-hitting action taking place on the football field.

100.     The NFL focuses on violence as one of the NFL's greatest selling points:  the football player as gladiator.  To advance the NFL's purpose, NFL Films has created numerous highlight features that focus solely on the hardest-hits that take place on the football field.  These featured videos are marketed and sold to advance the NFL's culture of violence as entertainment.

101.     The list of videos created by NFL Films glorifying violent plays includes, but is not limited to, the following titles: NFL: Moment of Impact (2007); NFL's 100 Greatest Tackles (1995); Big Blocks and King Size Hits (1990); The Best of Thunder and Destruction – NFL's Hardest Hits; NFL Films Video: Strike Force (1989); The NFL's Greatest Hits (1989); Crunch Course; Crunch Course II (1988); Crunch Masters; In the Crunch (1987); NFL Rocks; NFL Rocks: Extreme Football.

///
///

-12-

COMPLAINT FOR DAMAGES

**EX A, PAGE 31**

102.   NFL Films created the "Top Ten Most Feared Tacklers" series that was shown on the NFL Network, and it now has its own section on the NFL's website.   These features are comprised of videos highlighting the most vicious tacklers the NFL has ever seen.

103.   An explicit example of how the NFL markets and glorifies the violent nature of the NFL can be found on the back cover of the 2007 film "Moment of Impact."   The back cover of "Moment of Impact" advertises the film as follows: "First you hear the breathing, then you feel the wind coming through your helmet's ear hole. Suddenly you're down, and you're looking through your helmet's ear hole.   Pain? That's for tomorrow morning.   Right now you've gotta focus – focus on the play and try not to focus on the next moment of impact."   The NFL's entire message deemphasizes the damagers of these head impacts.

104.   NFL Films, therefore, advances the NFL's agenda to promote the most violent aspects of NFL football and to urge players at every level of the game to disregard the results of violent head impacts.

105.   The NFL strategically utilizes NFL Films' cinematography and sound to exaggerate and emphasize vicious hits.   The magnitude of the hit is emphasized by the slow-motion footage and the on-field microphones.   Vicious hits captured by NFL Films take on the appearance of the slow-motion crash safety test videos that appear in many car commercials - with players taking on the roll of the crash-test dummy.

106.   The NFL, through NFL Films, promotes a culture in which playing hurt or with an injury is both expected and highly acclaimed in its mythical gladiator world.   Through NFL Films, the NFL has produced videos that praise players who embody the ethos of playing hurt (for example, "Top Ten Gutsiest Performances").   This film and others like it celebrate players' ability to play through the pain and injury and promote an expectation among players and fans that players must and often do play through any injury, including MTBI.

///

-13-

COMPLAINT FOR DAMAGES

**EX A, PAGE 32**

107.    This is part of the overall culture in which NFL players are encouraged to play despite an injury, in part, because failure to play through an injury creates the risk of losing playing time, a starting position, and possibly a career.

108.    Within this culture, the NFL purposefully profits from the violence it promotes.

109.    Starting in 2010, the NFL, for the first time in its history, began to levy fines for excessive hits to the head.  As recently as October 2010, the NFL fined Pittsburgh Steelers' linebacker James Harrison $75,000.00 dollars for a vicious hit the NFL deemed "illegal" on Cleveland Browns' receiver Mohamed Massaquoi.    That same week the NFL fined New England Patriots' defender Brandon Meriweather and Atlanta Falcons' defender Dunta Robinson for hits the NFL also deemed "dangerous and illegal."  In total the NFL fined the three players approximately $175,000.00 for the hits.

110.    Notwithstanding those fines, in an effort to profit, the NFL sold photos of the illegal hits on its website for between $54.95 and $249.95.  Only after receiving negative publicity did the NFL removed the photos and acknowledge that it made a mistake to place photos of illegal and dangerous hits for sale on its website.

## Head Injuries, Concussions, and Neurological Damage

111.    It has been well known for many decades that repetitive and violent jarring of the head or impact to parts of the head can cause MTBI and long term, chronic neuro-cognitive sequelae.

112.    The defendants have known that the American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain.  TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue.  Symptoms of a TBI can be mild,

-14-

COMPLAINT FOR DAMAGES

**EX A, PAGE 33**

moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

113.   The Defendants have known for years that MTBI generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly. The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and sometimes unconsciousness.

114.   The defendant has known for years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party had not healed from the initial blow.

115.   The NFL has known for years that once a person suffers a MTBI he is up to four times more likely to sustain a second one. Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause MTBI, and the injured person requires more time to recover. This goes to the heart of the problem: players being unaware of the serious risk posed by returning to play before having allowed their initial head injury or concussion to heal fully.

116.   The NFL has known for years that clinical and neuro-pathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during an NFL player's career can cause severe cognitive problems such as depression and early-onset dementia.

117.   The NFL has known or should have known for decades, published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury. The brain injuries were documented in various kinds of injuries, including sports-related head impacts in both football and boxing.

118.   The NFL has known or should have known for decades that neuropathology studies, brain imaging tests, and  neuropsychological tests on many former football players, including former NFL players, have established that football players who sustain repetitive head impacts while playing the game

-15-

COMPLAINT FOR DAMAGES

have suffered and continue to suffer brain injuries that result in any one or more of the following conditions:  early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE").   The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above. CTE is also is associated with an increased risk of suicide.

119.    The NFL has known or should have known for decades that CTE is found in athletes with a history of repetitive head trauma. Published papers have shown this condition to be prevalent in retired professional football players who have a history of head injury.  The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

120.    The NFL has known for a considerable period of time of reported papers and studies documenting autopsies on over twenty-five former NFL players.  Reports show that over ninety percent of the players suffered from CTE.

121.    As a result, published peer reviewed scientific studies have shown that playing professional football is associated with significant risk for permanent brain injury.

122.    Published peer reviewed scientific studies have shown that 28% of the NFL retirees studied, suffered from depression, whereas the prevalence of depression in the general population is 9.5%.

123.    Published peer reviewed scientific studies have shown that 36% of NFL retirees, age 65-75, who were studied suffered from dementia, whereas the prevalence of dementia in the general population for the same age group is merely 2.2-6.5%.

-16-

COMPLAINT FOR DAMAGES

**EX A, PAGE 35**

124.    Published peer reviewed scientific studies have shown that retired players with three or more reported concussions had a fivefold prevalence of mild cognitive impairment (MCI) and a threefold prevalence of significant memory problems, compared to other retirees.

125.    In a study of NFL retirees, 11.1% of all respondents reported having a diagnosis of clinical depression.

126.    NFL retirees experience earlier onset of Alzheimer's-like symptoms more frequently than the general American male population in the same age range.

127.    Repeated head trauma can also result in so-called "Second Impact Syndrome," in which re-injury to a person who has already suffered a concussion triggers swelling that the skull cannot accommodate as discovered in 1973.

### The NFL Was and Is in a Superior Position of Knowledge and Authority and Owed a Duty to Players

128.    At all times, the NFL was and is in a position of superior knowledge as compared with all former NFL players who are Plaintiffs with respect to the risks associated with repetitive traumatic head impacts that involve sub-concussive and concussive injuries.

129.    On information and belief, over the past two decades, the NFL and paid consultants voluntarily and gratuitously consulted with independent physicians and neuro-cognitive specialists on the issue of head trauma to NFL players, and the NFL has ignored and suppressed professional advice on such diverse and important topics as: the recognition of the circumstances that can precipitate MTBI, the long-term potential consequences of MTBI on NFL players, and solutions for players who have sustained MTBI.

130.    At all relevant times, the NFL held a long standing duty to protect its players and the public at large to research, study, test, understand and address the risks of neurological injury—short term and

-17-

COMPLAINT FOR DAMAGES

long term—related to playing football in the NFL.  As such, the NFL owed a duty of reasonable care to educate players about the risks associated with repetitive head trauma and/or concussions, of which the NFL was aware and had been aware for many years. By gratuitously undertaking to study and publicly report about MBTI in professional football, the NFL assumed a duty not to mislead players and the general public about the risks of permanent neurological damage that can occur from MBTI incurred while playing football.

131.   Moreover, the NFL held a duty to protect its NFL players by providing truthful information about the risks of play in light of the fact that at all relevant times, the NFL knew that the vast majority of NFL players played under non-guaranteed contracts and, as such, would willingly (and unknowingly) expose themselves to additional neurological injury and an increased risk of harm solely to maintain those non-guaranteed contracts.

132.   Once the NFL assumed a duty to reasonably study and understand the exposure to MTBI and its long-term cognitive complications, it failed to act appropriately by covering-up, hiding, denying and repressing all pertinent information.  Instead of using this information for the safety of the players, the NFL fraudulently covered up its knowledge of the dangers.

### The NFL's Knew the Dangers and Risks Associated with Repetitive Head Impacts and Concussions

133.   For decades, the NFL has been aware that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, and CTE and its related symptoms.

134.   In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland

-18-

COMPLAINT FOR DAMAGES

**EX A, PAGE 37**

study"). The article was published in the Journal of the American Medical Association. The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

135. In 1937, the American Football Coaches Associates published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

136. In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers. After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that boxer suffers significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

137. The recommendations were codified as rules of the New York State Athletic Commission.

138. In or about 1952, the Journal of the American Medical Association published a study of encephalopathic changes in professional boxers.

139. That same year, an article published in the New England Journal of Medicine recommended a three-strike rule for concussions in football (i.e., recommending that players cease to play football after receiving their third concussion.)

140. In the 1960's and 70's, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram. By 1975 the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the

-19-

COMPLAINT FOR DAMAGES

National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

141.   In 1973, a potentially fatal condition known as "Second Impact Syndrome"—in which re-injury to the already-concussed brain triggers swelling that the skull cannot accommodate—was identified. It did not receive this name until 1984.   Upon information and belief, Second Impact Syndrome has resulted in the deaths of at least forty football players.

142.   Between 1952 and 1994, numerous studies were published in medical journals including the Journal of the American Medical Association, Neurology, and the New England Journal of Medicine, and Lancet warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions.   These studies collectively established that:

repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;

acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

mild head injury there is a relation between neurologic pathology and length of career in athletes who play contact sports;

immediate retrograde memory issues occur following concussions;

mild head injury requires recovery time without risk of subjection to further injury;

head trauma is linked to dementia; and

a football player who suffers a concussion requires significant rest before being subjected to further contact.

143.   In the early 1980's, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained mild traumatic brain injury and observed long-term damage in the form of unexpected cognitive impairment.   The studies were published in neurological journals and treatises.

-20-

COMPLAINT FOR DAMAGES

within the United States.  The results of the studies were reported in the Wall Street Journal and New York Times.

144.   In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered mild traumatic brain injuries suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

145.   The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

146.   In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines.

147.   By 1991, three distinct medical professionals/entities, all independent from the NFL—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

148.   In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players.  The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

149.   A 2000 study, which surveyed 1,090 former NFL players, found that more than sixty (60) percent had suffered at least one concussion, and twenty-six (26) percent had suffered three (3) or more, during their careers.  Those who had sustained concussions reported more problems with memory,

-21-

COMPLAINT FOR DAMAGES

concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

150.   Also in 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and (3) eight suffered from Alzheimer's disease.

151.   A 2001 report by Dr. Frederick Mueller that was published in the Journal of Athletic Training reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.  High school football produced the greatest number of football head-related deaths.  From 1984 through 1999, sixty-nine football head-related injuries resulted in permanent disability.

152.   In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research.  These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

///

///

-22-

COMPLAINT FOR DAMAGES

153.   This echoed similar medical protocol established at a Vienna conference in 2001. These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

154.   The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

155.   An ESPN report stated in 2006, "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

156.   Upon information and belief, in literally hundreds upon thousands of games and practices, concussed players—including those knocked entirely unconscious—were returned to play in the same game or practice.

157.   Indeed, while the NFL knew for decades of the harmful effects of concussions on a player's brain, it actively concealed these facts from coaches, trainers, players, and the public.

**The NFL Voluntarily Undertook the Responsibility of Studying Head Impacts In Football, Yet Fraudulently Concealed Their Long-Term Effects**

158.   As described above, the NFL has known for decades that multiple blows to the head can lead to long-term brain injury, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

159.   Rather than take immediate measures to protect its players from these known dangers, between the 1960s and 1994, the NFL failed to react to information readily available to it which warranted action to address this public health issue.

///

-23-

COMPLAINT FOR DAMAGES

160.    Then, in 1994, the NFL agreed to fund a voluntarily and gratuitously formulated committee to study the issue of head injury in the NFL.   Then NFL Commissioner Paul Tagliabue voluntarily and unilaterally formed a committee to study the issue in 1994.   This Committee, the Mild Traumatic Brain Injury Committee (the "MTBI Committee"), voluntarily undertook the responsibility of studying the effects of concussions on NFL players.

161.    At that time, the current NFL Commissioner, Roger Goodell ("Goodell"), was the NFL's Vice President and Chief Operating Officer.

162.    With the MTBI Committee, the NFL voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game.   Through its voluntary creation of the MTBI Committee, the NFL affirmatively assumed its long-standing duty to use reasonable care in the study of concussions and post-concussion syndrome in NFL players; the study of any kind of brain trauma relevant to the sport of football; the use of information developed; and the publication of data and/or pronouncements from the MTBI Committee.

163.    Rather than exercising reasonable care in these duties, the NFL immediately engaged in a long-running course of fraudulent and negligent conduct, which included a campaign of disinformation designed to (a) dispute accepted and valid neuroscience regarding the connection between repetitive traumatic brain injuries and concussions and degenerative brain disease such as CTE; and (b) to create a falsified body of research which the NFL could cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

164.    The NFL's response to the issue of brain injuries and degenerative brain disease in retired NFL players caused by concussions and repetitive brain trauma received during their years as professional football players has been, until very recently, a concerted effort of deception and denial.   The NFL actively

-24-

COMPLAINT FOR DAMAGES

tried to and did conceal the extent of the concussion and brain trauma problem, the risk to the Plaintiffs, and the risks to anyone else who played football.

165.   The MTBI Committee's stated goal was to present objective findings on the extent to which a concussion problem existed in the League, and to outline solutions.  Ironically, the MTBI Committee's studies were supposed to be geared toward "improv[ing] player safety" and for the purpose of instituting "rule changes aimed at reducing head injuries."

166.   By 1994, when the NFL formed the MTBI Committee, independent scientists and neurologists alike were already convinced that all concussions—even seemingly mild ones—were serious injuries that can permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently and without time to properly heal.

167.   The MTBI Committee was publicized by the NFL as independent from the NFL, consisting of a combination of doctors and researchers.

168.   The MTBI Committee, however, was not independent.  It consisted of at least five (5) members who were already affiliated with the NFL.

169.   Instead of naming a noted neurologist to chair the newly formed MTBI Committee, or at least a physician with extensive training and experience treating head injuries, Commissioner Tagliabue appointed Dr. Elliot Pellman, a rheumatologist who lacked any specialized training or education relating to concussions, and who was a paid physician and trainer for the New York Jets.

170.   Dr. Pellman had reportedly been fired by Major League Baseball for lying to Congress regarding his resume.

///

///

-25-

_____

COMPLAINT FOR DAMAGES

**EX A, PAGE 44**

171.     Dr. Pellman would go on to chair the MTBI Committee from 1994-2007, and his leadership of the Committee came under frequent and harsh outside criticism related to his deficient medical training, background, and experience.

172.     The fact that Dr. Pellman was a paid physician for an NFL Team was an obvious conflict of interest.  At no time was Dr. Pellman independent of the NFL, because he was paid on an ongoing basis by an NFL Team.

173.     The NFL failed to appoint any neuropathologist to the MTBI Committee.

174.     From its inception in 1994, the MTBI Committee allegedly began conducting studies to determine the effect of concussions on the long-term health of NFL players.

175.     NFL Commissioner Roger Goodell confirmed this in June 2007 when he stated publicly that the NFL had been studying the effects of traumatic brain injury for "close to 14 years . . . ."

176.     Under Dr. Pellman, the MTBI Committee spearheaded a disinformation campaign.

177.     Dr. Pellman and two other MTBI Committee members, Dr. Ira Casson, a neurologist, and Dr. David Viano, a biomedical engineer, worked to discredit scientific studies that linked head impacts and concussions received by NFL players to brain injuries.

178.     The MTBI Committee did not publish its first findings on active players until 2003.  In that publication, the MTBI Committee stated, contrary to years of independent findings, that there were no long term negative health consequences associated with concussions.

179.     The MTBI Committee published its findings in a series of sixteen (16) papers between 2003 and 2009.  According to the MTBI Committee, all of their findings supported a conclusion that there were no long term negative health consequences associated with concussions or brain injuries.  These findings regularly contradicted the research and experiences of neurologists who treat sports concussions and the players who endured them.

-26-

COMPLAINT FOR DAMAGES

**EX A, PAGE 45**

180.    Completely contrary to public findings and conclusions, the NFL's team of hand-picked so-called experts on the MTBI Committee did not find concussions to be of significant concern and felt it appropriate for players suffering a concussion to continue playing football during the same game or practice in which one was suffered.  This recommendation and practice by the NFL, promoted by the MTBI Committee, was irresponsible and dangerous.

181.    The MTBI Committee's methodology and the conclusions reached in its research were criticized by independent experts due to the numerous flaws in the study design, methodology, and interpretation of the data, which led to conclusions at odds with over 80 years of science and medicine.

182.    For example, in 2004 the MTBI Committee published a conclusion in which it claimed that its research found no risk of repeated concussions in players with previous concussions and that there was no "7- to 10- day window of increased susceptibility to sustaining another concussion."

183.    In a comment to this publication, one independent doctor wrote that "[t]he article sends a message that it is acceptable to return players while still symptomatic, which contradicts literature published over the past twenty years suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days."

184.    As a further example, an MTBI Committee conclusion in 2005 stated that "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season." "These data suggest," the MTBI Committee reported, "that these players were at no increased risk" of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation.

///
///

-27-

COMPLAINT FOR DAMAGES

185.   Yet, a 2003 NCAA study of 2,905 college football players found just the opposite: "Those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury."

186.   Support for this same conclusion was developed as early as 1982 in studies conducted at the University of Virginia.

187.   Dr. Pellman and his group stated repeatedly that the NFL study showed "no evidence of worsening injury or chronic cumulative effects of multiple [MTBI] in NFL players."

188.   The 2003 report by the Center for the Study of Retired Athletes at the University of North Carolina, however, found a link between multiple concussions and depression among former professional players with histories of concussions.  A 2005 follow-up study by the Center showed a connection between concussions and both brain impairment and Alzheimer's disease among retired NFL players.

189.   Other contrary conclusions that the MTBI Committee published at the behest, urging, and sponsorship of NFL over several years include, but are not limited to, the following:

> Drs. Pellman and Viano stated that because a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild [TBIs] in professional football are not serious injuries";

> that NFL players did not show a decline in brain function after a concussion;

> that there were no ill effects among those who had three (3) or more concussions or who took hits to the head that sidelined them for a week or more;

> that "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions"; and

> that NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

190.   The MTBI Committee's papers and conclusions were against the weight of the scientific evidence and based on biased data collection techniques.  They received significant criticism in the

-28-

COMPLAINT FOR DAMAGES

scientific and medical media from independent doctors and researchers and were met with skepticism in peer review segments following each article's publication.

191.    Renowned experts Dr. Robert Cantu and Dr. Julian Bailes wrote harshly critical reviews of the studies' conclusions.

192.    Dr. Cantu observed that the extremely small sample size and voluntary participation in the NFL's study suggested there was bias in choosing the sample.  According to Dr. Cantu, no conclusions should be drawn from the NFL study.

193.    A different scientist who reviewed the MTBI Committee's work further stated that the NFL appeared to be primarily preparing a defense for when injured players eventually sued, and that it seemed to be promoting a flawed scientific study to justify its conclusion that concussions do not have adverse effects on players.

194.    Dr. Kevin Guskiewicz has stated that the "data that hasn't shown up makes their work questionable industry-funded research."

195.    In and around 2009, The MTBI Committee's work was   criticized in the popular press by ESPN and the New York Times when repeated inconsistencies and irregularities in the MTBI Committee's data were revealed.

196.    An October 2006 ESPN article described how the MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players in the results of the Committee's studies on the effects of concussions and was selective in its use of injury reports.

197.    The results reported by Dr. Pellman and the MTBI Committee selectively excluded at least 850 baseline tests.  In a paper published in Neurosurgery in December 2004, Dr. Pellman and the other MTBI Committee members reported on the baseline data for 655 players and the results for 95 players who had undergone both baseline testing and post-concussion testing.  They concluded that NFL players did not

-29-

_____

COMPLAINT FOR DAMAGES

show a decline in brain function after suffering concussions. Their further analysis purportedly found no ill effects among those who had three or more concussions or who took hits to the head that kept them out for a week or more. The paper did not explain where the players in the study groups came from specifically or why certain player data was included and that data from hundreds of other players was not.

198. The October 2006 ESPN article further revealed that Dr. Pellman had fired a neuropsychologist for the New York Jets, Dr. William Barr, after Dr. Barr presented at a conference some NCAA study findings that contradicted NFL practices.

199. As described in the following paragraphs, when faced with studies which implicated a causal link between concussions and cognitive degeneration, the NFL, through the MTBI Committee, continued to produce contrary findings which were false, distorted, and deceptive to NFL players, participants in football nationwide, and the public at large.

200. Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players, including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk. Dr. Omalu concluded that the players suffered from CTE.

201. All of these individuals suffered multiple concussions during their NFL careers. Later in life, each exhibited symptoms of deteriorated cognitive functions, paranoia, panic attacks, and depression.

202. Some of Dr. Omalu's findings were published in Neurosurgery. Those findings included that Webster's and Long's respective deaths were partially caused by CTE and were related to multiple concussions suffered during their activity in the NFL.

203. In response to Dr. Omalu's articles, the MTBI Committee wrote a letter to the editor, Dr. Michael Apuzzo who was an agent of the NFL, of Neurosurgery asking that Dr. Omalu's article be retracted.

///

-30-

COMPLAINT FOR DAMAGES

204.   In an article published in Neurosurgery in 2007, Dr. Cantu reached a similar conclusion regarding Andre Waters as Dr. Omalu had reached as to Webster and Long.

205.   A 2003 study partially authored by Dr. Kevin Guskiewicz analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression. The study found that having three or four concussions meant twice the risk of depression as never-concussed players and five or more concussions meant a nearly threefold risk.

206.   The NFL's MTBI Committee attacked these studies.

207.   In November 2003, Dr. Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research. Dr. Pellman called Dr. Guskiewicz in advance and questioned whether it was in the best interest of Dr. Guskiewicz to appear on the program. On the program, Dr. Pellman stated unequivocally that he did not believe the results of the study led by Dr. Guskiewicz.

208.   In 2005, Dr. Guskiewicz performed a clinical follow-up study, and found that retired players who sustained three or more concussions in the NFL had a five-fold prevalence of mild cognitive impairment in comparison to NFL retirees without a history of concussions. In doing this research, Dr. Guskiewicz conducted a survey of over 2,550 former NFL athletes.

209.   The MBTI Committee attacked and sought to undermine the study, issuing the following excuse and delay tactic: "We want to apply scientific rigor to this issue to make sure that we're really getting at the underlying cause of what's happening. . . . You cannot tell that from a survey."

210.   In August 2007, the NFL, in keeping with its scheme of fraud and deceit, issued a concussion pamphlet to players which stated:

> Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly. It is important to understand that there is no magic number for how many concussions is too many. Research is currently underway to determine if there are any long-term effects of concussion[s] in NFL athletes.

-31-

COMPLAINT FOR DAMAGES

211.   In a statement made around the time that the concussion pamphlet was released, NFL Commissioner Roger Goodell said, "We want to make sure all NFL players . . . are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact on concussions."   The NFL decided that the "most up to date information" did not include the various independent studies indicating a causal link between multiple concussions and cognitive decline in later life.

212.   Goodell also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

213.   The Plaintiffs relied to their detriment on the NFL's disinformation, all of which was contrary to the findings of the independent scientists who had studied the issue, including Drs. Guskiewicz, Cantu, Omalu, and Bailes, regarding the causal link between multiple head injuries and concussions and cognitive decline.

214.   Facing increasing media scrutiny over the MTBI Committee's questionable studies, Dr. Pellman eventually resigned as the head of the Committee in February 2007.  He was replaced as head by Dr. Ira Casson and Dr. David Viano, but remained a member of the Committee.

215.   Dr. Guskiewicz, research director of the University of North Carolina's Center for the Study of Retired Athletes, said at the time that Dr. Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective."

216.   Regarding Dr. Pellman's work, Dr. Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or two you are at increased risk for future concussions," but "[Dr. Pellman] continued to say on the record that's not what they find and there's no truth to it."

-32-

COMPLAINT FOR DAMAGES

**EX A, PAGE 51**

217.    Drs. Casson and Viano continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries.  In 2007, in a televised interview on HBO's Real Sports, Dr. Casson definitively and unequivocally stated that there was no link between concussions and depression, dementia, Alzheimer's disease, or "anything like [that] whatsoever." 47. In June 2007, the NFL convened a concussion summit for team doctors and trainers.  Independent scientists, including Drs. Cantu, and Guskiewicz, presented their research to the NFL.

218.    Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the MTBI Committee on the findings of Dr. Omalu and other independent studies linking multiple NFL head injuries with cognitive decline.  Dr. Bailes recalled that the MTBI's Committee's reaction to his presentation was adversarial:  "The Committee got mad . . . we got into it.  And I'm thinking, 'This is a . . . disease in America's most popular sport and how are its leaders responding?  Alienate the scientist who found it?  Refuse to accept the science coming from him?'"

219.    At the summit, Dr. Casson told team doctors and trainers that CTE has never been scientifically documented in football players.

220.    After reviewing five years of data of on-field concussions, the NFL concluded that there was no evidence for an increase in secondary brain injuries after a concussion.

221.    In 2008, Boston University's Dr. Ann McKee found CTE in the brains of two more deceased NFL players, John Grimsley and Tom McHale.  Dr. McKee stated, "the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions." Dr. McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

222.    A MTBI Committee representative characterized each study as an "isolated incident" from which no conclusion could be drawn, and said he would wait to comment further until Dr. McKee's research was published in a peer-reviewed journal.  When Dr. McKee's research was published in 2009,

-33-

COMPLAINT FOR DAMAGES

Dr. Casson asserted that "there is not enough valid, reliable or objective scientific evidence at present to determine whether . . . repeat head impacts in professional football result in long[-]tem brain damage."

223.   In 2008, under increasing pressure, the NFL commissioned the University of Michigan's Institute for Social Research to conduct a study on the health of retired players.  Over 1,000 former NFL players took part in the study.  The results of the study, released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population---including a rate of 19 times the normal rate for men ages 30 through 49."

224.   The NFL, who commissioned the study, responded to these results by claiming that the study was incomplete, and that further findings would be needed.  NFL spokesperson Greg Aiello stated that the study was subject to shortcomings and did not formally diagnose dementia.  Dr. Casson implied that the Michigan study was inconclusive and stated that further work was required.  Other experts in the field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

225.   On February 1, 2010, Dr. Omalu spoke before members of the House Judiciary Committee at a forum in Houston, Texas, with regard to "Head and Other Injuries in Youth, High School, College, and Professional Football."  In his testimony, Dr. Omalu stated that (a) the medical community has known about concussions and the effects of concussions in football for over a century; (b) that every blow to the head is dangerous; and (c) that repeated concussions and traumatic brain injury have the capacity to cause permanent brain damage.

///

///

///

-34-

COMPLAINT FOR DAMAGES

**The Congressional Inquiry and**
**The NFL's Acknowledgement of the Concussion Crisis**

226.    Shortly after the results of the Michigan study were released, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

227.    Drs. Cantu and McKee testified before the House of Representatives, Committee on the Judiciary, to discuss the long term impact of football-related head injuries.

228.    At the first hearing in October 2009, NFL Commissioner Roger Goodell acknowledged that the NFL owes a duty to the public at large to educate them as to the risks of concussions due to the League's unique position of influence: "In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players also do so and nearly seventy five thousand collegiate players as well.  We must act in their best interests even if these young men never play professional football."

229.    When Representative Sanchez questioned Goodell about the limited nature of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the conflicts of interest of those directing the studies, and the potential for bias, Goodell evaded answering the questions.

230.    Also at the October hearing, NFL Players' Association ("NFLPA") Executive Director DeMaurice Smith stated, "[T]here have been studies over the last decade highlighting [connection between on-field injury and post career mental illness].  Unfortunately, the N.F.L. has diminished those studies, urged the suppression of the findings and for years, moved slowly in an area where speed should have been the impetus."

///
///

-35-

COMPLAINT FOR DAMAGES

EX A, PAGE 54

231.    After the Congressional hearings, the NFLPA called for the removal of Dr. Casson as MTBI Committee co-chair, and stated, "Our view is that he's a polarizing figure on this issue, and the players certainly don't feel like he can be an impartial party on this subject."

232.    Dr. Casson gave testimony at these hearings, and continued to deny the validity of other non-NFL studies, stating that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

233.    Shortly after the 2009 congressional hearings, however, the NFL announced that it would impose its most stringent rules to date on managing concussions, requiring players who exhibit any significant sign of concussion to be removed from a game or practice and be barred from returning the same day.

234.    On December 17, 2009, Cincinnati Bengals wide receiver Chris Henry, 26, who played in the NFL from 2004 to 2009, died after falling from the back of a truck.  Drs. Omalu and Bailes performed a postmortem study on Chris Henry's brain and diagnosed him with CTE.

235.    The NFL's belated change of policy contradicted past recommendations by its MTBI Committee which had recommended as safe the League's practice of returning players to games or practices after suffering a concussion.  In fact, the MTBI Committee had published a paper in 2005 that stated "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."

236.    In January 2010, the House Judiciary Committee held further hearings on football player head injuries.  Representative Conyers observed that "until recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment in the future."

-36-

COMPLAINT FOR DAMAGES

**EX A, PAGE 55**

237. Representative Linda Sanchez commented that "[i]t seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years. Why did it take 15 years?"

238. In 2010, the NFL re-named the MTBI Committee the "Head, Neck, and Spine Medical Committee" (the "Medical Committee") and announced that Dr. Pellman would no longer be a member of the panel. Drs. H. Hunt Batjer and Richard G. Ellenbogen were selected to replace Drs. Casson and Viano. The two new co-chairmen selected Dr. Mitchel S. Berger to serve on the new Medical Committee.

239. Under its new leadership, the Committee admitted that data collected by the NFL's formerly appointed brain-injury leadership was "infected," and said that their Committee should be assembled anew. The Medical Committee formally requested that Dr. Pellman not speak at one of its initial conferences.

240. During a May 2010 Congressional hearing, a Congressman made it plain to Drs. Batjer and Ellenbogen that the NFL: "[had] years of an infected system here, and your job is . . . to mop [it] up."

241. Shortly after the May 2010 hearing, Dr. Batjer was quoted as admitting, "[w]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable to us. I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

**The NFL's New Committee**

242. In October 2011, Dr. Mitchel Berger of the NFL's Head, Neck, and Spine Medical Committee announced that a new study was in the planning process. He admitted that the MTBI Committee's previous long-range study was useless because "[t]here was no science in that." Dr. Berger further stated that data from the previous study would not be used. "We're really moving on from that data. There's really nothing we can do with that data in terms of how it was collected and assessed."

///

-37-

COMPLAINT FOR DAMAGES

243. On October 23, 2011, San Diego Charger Kris Dielman suffered a concussion early in a game and could be seen staggering back to the huddle. Despite the obvious brain injury, Mr. Dielman was neither evaluated by a doctor nor held out for even one play. He suffered grand mal seizures on the team's plane ride home.

244. Ten days later, in November 2011, the NFL's injury and safety panel issued a directive telling its game officials to watch closely for concussion symptoms in players.

245. Why in 1994 (and far earlier) the NFL (and its MTBI Committee) failed to change policies, share accurate information, impose strict fines and give adequate warnings is difficult to comprehend in light of the fact that the NFL has known for decades that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression, and CTE and its related symptoms. Instead, the NFL misled players, coaches, trainers, and the public, and actively spread disinformation.

246. It took decades for the NFL to admit that there was a problem and sixteen years to admit that its information was false and inaccurate. The NFL's conduct in this regard is willful and wanton and exhibits a reckless disregard for the safety of its players and the public at large. At a minimum, the NFL acted with callous indifference to the duty to the Plaintiffs and players at every level of the game.

247. As a direct result of the fraudulent concealment and misrepresentations of the NFL, former players have for many decades been led to believe that the symptoms of early-onset dementia, loss of memory, headaches, confusion, and the inability to function were not caused by events occurring while they played in the NFL. And, as a result of this willful and malicious conduct, these former players have been deprived of medical treatment, incurred expenses, lost employment, suffered humiliation and other damages to be specified.

///

///

-38-

COMPLAINT FOR DAMAGES

## ALLEGATIONS AGAINST RIDDELL

248.   Riddell has operated through designing, developing, manufacturing, selling and distributing football equipment, including helmets, in one form or another, since 1922.

249.   As early as the 1930's, players began using helmets during football games.   These early helmets were constructed from pieces of cobbled leather.

250.   In the early 1940's, John T. Riddell, who later formed John T. Riddell Incorporated, invented the first plastic suspension helmet.  In 1949, plastic helmets became legalized.

251.   Throughout the latter half of the 20th century and continuing to present day, Riddell has designed, developed, manufactured, sold, and distributed equipment used in the NFL, including equipment used by Plaintiffs, including, but not limited to, the following:

(a)   In the 1950's, Riddell manufactured a face-mask component for its helmets, which was eventually patented.

(b)   In 1962, Riddell used a "U" shaped nose protector with a shell (known as the TK2) molded out of polycarbonate.   Riddell also designed an open/closed cell foam and composite liner system for this model to increase the efficiency of the webbed suspension.

(c)   In 1963, Riddell developed the TAK-29 helmet, which was the first to use air inflation for fitting the helmet snug to the head.   The TAK-29 shell, like the TK2, displayed the protective polycarbonate plastic, in addition to including tough shock and cut-resistant face-mask attachment straps.

(d)   In 1969, recognizing that head protection was a key factor in helmet design requiring durable head protection, Riddell constructed a micro-fit helmet model with injection

-39-

COMPLAINT FOR DAMAGES

**EX A, PAGE 58**

molding technology to create a one-piece shell to improve the structural integrity of the entire helmet.

(e)   In 1973, Riddell developed, designed, manufactured, sold, and/or distributed an air cushion helmet whose interior system consisted of individual vinyl air cushions with layers of fitting and energy absorbing foam.  When a blow was struck, the air in the cushion was expelled through a single vent, greatly reducing the initial impact.  With the exhausting of the air cushion, the compressed fitting foam was further compressed, reducing impact.

(f)   In 1977, Riddell developed, designed, manufactured, sold, and/or distributed a stainless steel face-mask which offered greater bend resistance that prevented helmet breakage at the drill holes.

(g)   In 1981, Riddell developed, designed, manufactured, sold, and/or distributed an Air Cushion Engineered helmet.

(h)   In 1982, Riddell developed, designed, manufactured, sold, and/or distributed a M155 helmet model with a combination of foam and liquid-filled cells used for padding. On impact, the liquid would be throttled from one cell to the next, resulting in energy attenuation.  The M155 helmet model included one-piece injection-molded face-masks which were mar and rust-resistant, in addition to polyurethane face mask straps and universal jaw pads.

(i)   In 2002, Riddell developed, designed, manufactured, sold, and/or distributed the Riddell Revolution helmet designed with the intent of reducing the risk of concussion.

///

-40-

COMPLAINT FOR DAMAGES

**EX A, PAGE 59**

(j)   In 2003, Riddell developed, designed, manufactured, sold, and/or distributed a real-time, Head Impact Telemetry System (HITS) to monitor and record significant incidences of head impact sustained during a football game or practice.  The system measured the location, magnitude, duration, and direction of head acceleration and transmitted that information wirelessly to the sideline.

(k)   In 2006, Riddell provided a research grant to the University of Pittsburgh Medical Center for head injury research.  The study compared rates of high school athletes who wore the Riddell Revolution helmet with those who wore traditional helmets.

(l)   In 2007, Riddell developed, designed, manufactured, sold, and/or distributed an individual helmet system, Revolution IQ Hits™, allowing players to monitor the number and severity of impacts received during games and practices.  On-board electronics record every impact, allowing players to upload and evaluate each occurrence on their home computers.

(m)   In 2001, Riddell developed, designed, manufactured, sold, and/or distributed the 360 helmet which uses energy-managing materials and a face mask attachment system to disperse the energy of frontal impacts.  According to Riddell, it developed this helmet using over 1.4 million impacts collected through Riddell's HITS technology.

252.   Riddell is currently the official helmet of the NFL.  As the official helmet for the NFL, Riddell is the only helmet manufacturer allowed to display its logo on helmets wore by players during NFL games.  Upon information and belief, Plaintiffs wore Riddell helmets at times while playing and/or practicing during their NFL careers.

///
///

-41-

COMPLAINT FOR DAMAGES

**EX A, PAGE 60**

253. Riddell at all times herein mentioned engaged in the business of selling, manufacturing, designing, testing, engineering, marketing, modifying, assembling, inspecting, distributing, and controlling the helmets and other similar equipment for use by Plaintiffs and within the NFL.

254. Plaintiffs did not know the long-term effects of concussions and relied on the NFL and Riddell to protect them.

## RIDDELL'S DUTY TO
## PROTECT AGAINST THE LONG-TERM RISK OF CONCUSSIONS

255. Despite years of science and medicine linking the risk of long term brain injury from repeat concussions, it was not until the release of the Revolution Helmet wherein a notification reminding players to "sit out" if they suffer a concussion was placed on the Revolution helmet.

256. Around the same time, Riddell developed the HITS system to monitor the severity and incident of impacts that a player receives.

257. Based on a 2003 University of Pittsburgh Medical Center study funded by a grant from Riddell, the defendants began to market the Revolution helmet as reducing concussions by 31%.

258. However, both the HITS system and Revolution helmet both created by Riddell and its employees have been criticized by experts for their inaccurate marketing as being safer in reducing the risk of concussion.

259. A study published in the Journal of Neurosurgery showed that the study by UPMC was flawed in that is discounted low impact hits and in turn proved that the Revolution did not reduce the risk of concussions.

260. Even to this day Riddell's helmets do not acknowledge a link between repeat concussions and later life cognitive problems.

///

-42-

COMPLAINT FOR DAMAGES

**EX A, PAGE 61**

261. In fact, Riddell has never warned any Plaintiff or retired player of the long-term health effects of concussions.

### JOSEPH and M. STORMÉ SWEET

262. Plaintiff Joseph Sweet was born on July 5, 1948. He is married to M, Stormé and they currently reside in Phillips Ranch, California.

263. Plaintiff Joseph Sweet played Wide Receiver for the Los Angeles Rams from 1971 to 1973, the New England Patriots in 1974, and the San Diego Chargers from 1975 to 1976.

264. Plaintiff Joseph Sweet suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

265. Plaintiff Joseph Sweet was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

266. Plaintiff Joseph Sweet suffers from multiple past traumatic brain injuries with various symptoms.

### MICHAEL R. and MARY BALDISSAN

267. Plaintiff Michael R. Baldassin was born on July 26, 1955. He is married to Mary and they currently reside in Lakewood, Washington.

268. Plaintiff Michael R. Baldassin played Linebacker for the San Francisco 49ers from 1977 to 1979.

269. Plaintiff Michael R. Baldassin suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

///
///

-43-

270. Plaintiff Michael R. Baldassin was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

271. Plaintiff Michael R. Baldassin suffers from multiple past traumatic brain injuries with various symptoms.

### TONY and ALLISON BOUIE

272. Plaintiff Tony Bouie was born on August 7, 1972. He is married to Allison and they currently reside in Anthem, Arizona.

273. Plaintiff Tony Bouie played Safety for the Tampa Bay Buccaneers from 1995 to 1998.

274. Plaintiff Tony Bouie suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

275. Plaintiff Tony Bouie was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

276. Plaintiff Tony Bouie suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, short term memory loss.

### IRV CROSS and ELIZABETH CROSS

277. Plaintiff Irv Cross was born on July 27, 1939. He is married to Elizabeth and they currently reside in Roseville, Minnesota.

278. Plaintiff Irv Cross played Defensive Back for the Philadelphia Eagles from 1961 to 1965, and 1969, and the Los Angeles Rams from 1966 to 1968.

279. Plaintiff Irv Cross suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

-44-

COMPLAINT FOR DAMAGES

**EX A, PAGE 63**

280.   Plaintiff Irv Cross was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

281.   Plaintiff Irv Cross suffers from multiple past traumatic brain injuries with various symptoms.

### LARRY EDWARDS

282.   Plaintiff Larry Edwards was born on December 18, 1948.  He currently resides in Houston, Texas.

283.   Plaintiff Larry Edwards played Linebacker for the New York Giants in 1972.

284.   Plaintiff Larry Edwards suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

285.   Plaintiff Larry Edwards was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

286.   Plaintiff Larry Edwards suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss, headaches, and dizziness.

### PAUL FLATLEY

287.   Plaintiff Paul Flatley was born on January 30, 1941.  He currently resides in Richmond, Indiana.

288.   Plaintiff Paul Flatley played Wide Receiver for the Minnesota Vikings from 1963 to 1967 and the Atlanta Falcons from 1968 to 1970.

289.   Plaintiff Paul Flatley suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

-45-

COMPLAINT FOR DAMAGES

290.   Plaintiff Paul Flatley was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

291.   Plaintiff Paul Flatley suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss.

### DAVID L. GRAYSON, SR.

292.   Plaintiff David L. Grayson, Sr. was born on June 6, 1939.  He currently resides in San Diego, California.

293.   Plaintiff David L. Grayson, Sr. played Defensive Back for the Dallas Texans from 1961 to 1962, the Kansas City Chiefs from 1963 to 1964, and the Oakland Raiders from 1965-1969.

294.   Plaintiff David L. Grayson, Sr. suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

295.   Plaintiff David L. Grayson, Sr. was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

296.   Plaintiff David L. Grayson, Sr. suffers from multiple past traumatic brain injuries with various symptoms including, but not limited, memory loss.

### MELVIN HOOVER

297.   Plaintiff Melvin Hoover was born on August 21, 1959.  He currently resides in Charlotte, North Carolina.

298.   Plaintiff Melvin Hoover played Wide Receiver for the Philadelphia Eagles from 1982 to 1985, the New York Giants in 1981, and the Detroit Lions in 1987.

///

-46-

COMPLAINT FOR DAMAGES

**EX A, PAGE 65**

299.   Plaintiff Melvin Hoover suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

300.   Plaintiff Melvin Hoover was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

301.   Plaintiff Melvin Hoover suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss and headaches.

## DOUG LONG, DECEASED (Kristie Long, Administratrix)

302.   Doug Long was born on May 24, 1955.  He died on January 12, 2012.

303.   Doug Long played for the Seattle Seahawks from 1977 to 1979 as a Wide Receiver and Defensive Back.

304.   Doug Long suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

305.   Doug Long was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

306.   Doug Long died from brain cancer and CTE caused from his repeated concussions and Plaintiffs were unaware of the source due to active fraud by the Defendants.

## MARVIN MATTOX

307.   Plaintiff Marvin Mattox was born on August 7, 1965.  He currently resides in Oklahoma City, Oklahoma.

308.   Plaintiff Marvin Mattox played Strong Safety for the San Diego Chargers from 1988 to 1989.

-47-

COMPLAINT FOR DAMAGES

309. Plaintiff Marvin Mattox suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

310. Plaintiff Marvin Mattox was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

311. Plaintiff Marvin Mattox suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss.

## MICHAEL W. and RANDI McKIBBEN

312. Plaintiff Michael W. McKibben was born on September 3, 1956. He is married to Randi and they currently reside in Pittsburgh, Pennsylvania.

313. Plaintiff Michael W. McKibben played Linebacker for the New York Jets from 1979 to 1981.

314. Plaintiff Michael W. McKibben suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

315. Plaintiff Michael W. McKibben was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

316. Plaintiff Michael W. McKibben suffers from multiple past traumatic brain injuries with various symptoms.

## BRUCE McNORTON

317. Plaintiff Bruce McNorton was born on February 28, 1959. He currently resides in Daytona Beach, Florida.

-48-

COMPLAINT FOR DAMAGES

**EX A, PAGE 67**

318. Plaintiff Bruce McNorton played Cornerback for the Detroit Lions from 1982 to 1990 and the Miami Dolphins in 1991.

319. Plaintiff Bruce McNorton suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

320. Plaintiff Bruce McNorton was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

321. Plaintiff Bruce McNorton suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, headaches and memory loss.

**REGGIE REMBERT**

322. Plaintiff Reggie Rembert was born on December 25, 1966. He currently resides in Indianapolis, Indiana.

323. Plaintiff Reggie Rembert played Wide Receiver for the Cincinnati Bengals from 1991 to 1993.

324. Plaintiff Reggie Rembert suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

325. Plaintiff Reggie Rembert was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

326. Plaintiff Reggie Rembert suffers from multiple past traumatic brain injuries with various symptoms.

///
///

-49-

COMPLAINT FOR DAMAGES

**EX A, PAGE 68**

## GREG TURNER and RHONDA HATCHER

327. Plaintiff Greg Turner was born on June 12, 1952. He is married to Rhonda Hatcher and they currently reside in Glendale, Arizona.

328. Plaintiff Greg Turner played Linebacker for the Houston Oilers from 1985 to 1986.

329. Plaintiff Greg Turner suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

330. Plaintiff Greg Turner was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

331. Plaintiff Greg Turner suffers from multiple past traumatic brain injuries with various symptoms.

## DELVIN WILLIAMS

332. Plaintiff Delvin Williams was born on April 17, 1951. He currently resides in Mountain View, California.

333. Plaintiff Delvin Williams played Running Back for the San Francisco 49ers from 1974 to 1977, the Miami Dolphins from 1978 to 1980, and the Green Bay Packers in 1981.

334. Plaintiff Delvin Williams suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

335. Plaintiff Delvin Williams was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

336. Plaintiff Delvin Williams suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, memory loss.

-50-

COMPLAINT FOR DAMAGES

## STEVEN KENNEY

337.    Plaintiff Steven Kenney was born on December 26, 1955 and he currently resides in Raleigh, North Carolina.

338.    Plaintiff Steven Kenney played Guard for the Philadelphia Eagles from 1979 to 1985 and the Detroit Lions in 1986.

339.    Plaintiff Steven Kenney suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

340.    Plaintiff Steven Kenney was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

341.    Plaintiff Steven Kenney suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## RALPH GREGORY SAMPSON

342.    Plaintiff Ralph Gregory Sampson was born on October 25, 1950 and he currently resides in Carlsbad, California.

343.    Plaintiff Ralph Gregory Sampson played Offensive Tackle for the Houston Oilers from 1972 to 1979.

344.    Plaintiff Ralph Gregory Sampson suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

345.    Plaintiff Ralph Gregory Sampson was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

-51-

COMPLAINT FOR DAMAGES

**EX A, PAGE 70**

346.   Plaintiff Ralph Gregory Sampson suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### ERIC SMEDLEY

347.   Plaintiff Eric Smedely was born on July 23, 1973 and he currently resides in Regina, Saskatchewan, Canada.

348.   Plaintiff Eric Smedley played Defensive back for the Buffalo Bills from 1996 to 1999 and the Indianapolis Colts from 1999 to 2000.

349.   Plaintiff Eric Smedley suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

350.   Plaintiff Eric Smedley was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

351.   Plaintiff Eric Smedley suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### BENJAMIN STANLEY

352.   Plaintiff Benjamin Stanley was born on January 29, 1976 and he currently resides in Tyler, Texas.

353.   Plaintiff Benjamin Stanley played Punter for the San Francisco 49ers from 1999 to 2000, the Arizona Cardinals in 2001, and the Houston Texans from 2002 to 2007.

354.   Plaintiff Benjamin Stanley suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

///
///

-52-

COMPLAINT FOR DAMAGES

**EX A, PAGE 71**

355.   Plaintiff Benjamin Stanley was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

356.   Plaintiff Benjamin Stanley suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## CASEY FITZSIMMONS

357.   Plaintiff Casey FitzSimmons was born on October 10, 1980 and he currently resides in Canyon Creek, Montana.

358.   Plaintiff Casey FitzSimmons played Tight end/Fullback for the Detroit Lions from 2003 to 2010.

359.   Plaintiff Casey FitzSimmons suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

360.   Plaintiff Casey FitzSimmons was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

361.   Plaintiff Casey FitzSimmons suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## JOHN FARRIS

362.   Plaintiff John Farris was born on November 2, 1943 and he currently resides in San Diego, California.

363.   Plaintiff John Farris played Guard for the San Diego Chargers from 1965 to 1966.

364.   Plaintiff John Farris suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

-53-

COMPLAINT FOR DAMAGES

**EX A, PAGE 72**

365. Plaintiff John Farris was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

366. Plaintiff John Farris suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## CHARLES BEATTY

367. Plaintiff Charles Beatty was born on February 8, 1946 and he currently resides in Waxahachie, Texas.

368. Plaintiff Charles Beatty played Safety for the Pittsburgh Steelers from 1969 to 1972 and the St. Louis Cardinals in 1972.

369. Plaintiff Charles Beatty suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

370. Plaintiff Charles Beatty was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

371. Plaintiff Charles Beatty suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## EDWARD BELL

372. Plaintiff Edward Bell was born on September 13, 1946 and he currently resides in Fort Worth, Texas.

373. Plaintiff Edward Bell played Wide Receiver for the New York Jets from 1970 to 1975 and the San Diego Chargers in 1976.

///

-54-

COMPLAINT FOR DAMAGES

**EX A, PAGE 73**

374. Plaintiff Edward Bell suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

375. Plaintiff Edward Bell was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

376. Plaintiff Edward Bell suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### SAMUEL BLACKWELL

377. Plaintiff Samuel Blackwell was born on July 23, 1959 and he currently resides in Hampton, Virginia.

378. Plaintiff Samuel Blackwell played Guard for the Philadelphia Eagles from 1982 to 1987, the Pittsburgh Steelers from 1987-1990 and the Seattle Seahawks in 1991.

379. Plaintiff Samuel Blackwell suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

380. Plaintiff Samuel Blackwell was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

381. Plaintiff Samuel Blackwell suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### JERAMETRIUS BUTLER

382. Plaintiff Jerametrius Butler was born on November 28, 1978 and he currently resides in Cedar Hill, Texas.

///

-55-

COMPLAINT FOR DAMAGES

383. Plaintiff Jerametrius Butler played Defensive Back for the St. Louis Rams from 2001 to 2006 and the Buffalo Bills in 2007.

384. Plaintiff Jerametrius Butler suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

385. Plaintiff Jerametrius Butler was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

386. Plaintiff Jerametrius Butler suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## ROOSEVELT COLLINS JUNIOR

387. Plaintiff Roosevelt Collins Jr. was born on January 25, 1968 and he currently resides in Grand Prairie, Texas.

388. Plaintiff Roosevelt Collins Jr. played Linebacker for the Miami Dolphins in 1992.

389. Plaintiff Roosevelt Collins Jr. suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

390. Plaintiff Roosevelt Collins Jr. was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

391. Plaintiff Roosevelt Collins Jr. suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## DENNIS DEVAUGHN

392. Plaintiff Dennis DeVaughn was born on October 28, 1960 and he currently resides in Plano, Texas.

-56-

COMPLAINT FOR DAMAGES

**EX A, PAGE 75**

393.   Plaintiff Dennis DeVaughn played Defensive Back for the Philadelphia Eagles from 1982 to 1983.

394.   Plaintiff Dennis DeVaughn suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

395.   Plaintiff Dennis DeVaughn was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

396.   Plaintiff Dennis DeVaughn suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### ROBERT FARMER 11

397.   Plaintiff Robert Farmer II was born on March 4, 1974 and he currently resides in Waxhaw, North Carolina.

398.   Plaintiff Robert Farmer II played Running Back for the New York Jets in 1999.

399.   Plaintiff Robert Farmer II suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

400.   Plaintiff Robert Farmer II was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

401.   Plaintiff Robert Farmer II suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### CEDRICK HARDMAN

402.   Plaintiff Cedrick Hardman was born on October 4, 1948 and he currently resides in Laguna Beach, California.

-57-

COMPLAINT FOR DAMAGES

**EX A, PAGE 76**

403.    Plaintiff Cedrick Hardman played Defensive End for the San Francisco 49ers from 1970 to 1979 and the Oakland Raiders from 1980 to 1981.

404.    Plaintiff Cedrick Hardman suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

405.    Plaintiff Cedrick Hardman was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

406.    Plaintiff Cedrick Hardman suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## LARRY MALLORY

407.    Plaintiff Larry Mallory was born on July 21, 1952 and he currently resides in Arlingotn, Texas.

408.    Plaintiff Larry Mallory played Defensive Back for the New York Giants from 1976 to 1978.

409.    Plaintiff Larry Mallory suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

410.    Plaintiff Larry Mallory was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

411.    Plaintiff Larry Mallory suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## COREY MAYFIELD

412.    Plaintiff Corey Mayfield was born on February 25, 1970 and he currently resides in Forney, Texas.

-58-

COMPLAINT FOR DAMAGES

**EX A, PAGE 77**

413.   Plaintiff Corey Mayfield played Defensive Tackle for the Miami Dolphins in 1992 and the Jacksonville Jaguars in 1995.

414.   Plaintiff Corey Mayfield suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

415.   Plaintiff Corey Mayfield was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

416.   Plaintiff Corey Mayfield suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## VINCENT McCOY

417.   Plaintiff Vincent McCoy was born on March 21, 1952 and he currently resides in Ruskin, Florida.

418.   Plaintiff Vincent McCoy played Tight End for the Washington Redskins from 1975 to 1977 and the Green Bay Packers from 1978 to 1979.

419.   Plaintiff Vincent McCoy suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

420.   Plaintiff Vincent McCoy was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

421.   Plaintiff Vincent McCoy suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

///
///

-59-

COMPLAINT FOR DAMAGES

**EX A, PAGE 78**

**ERIC MITCHEL**

422.   Plaintiff Eric Mitchel was born on February 13, 1967 and he currently resides in Mansfield, Texas.

423.   Plaintiff Eric Mitchel played Running Back for the New England Patriots in 1989 and the Dallas Cowboys in 1992.

424.   Plaintiff Eric Mitchel suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

425.   Plaintiff Eric Mitchel was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

426.   Plaintiff Eric Mitchel suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

**JERRY OVERTON**

427.   Plaintiff Jerry Overton was born on January 1, 1941 and he currently resides in Graham, Texas.

428.   Plaintiff Jerry Overton played Defensive Back for the Dallas Cowboys in 1963.

429.   Plaintiff Jerry Overton suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

430.   Plaintiff Jerry Overton was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

431.   Plaintiff Jerry Overton suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

-60-

COMPLAINT FOR DAMAGES

## ISIAH ROBERTSON

432.   Plaintiff Isiah Robertson was born on August 17, 1949 and he currently resides in Garland, Texas.

433.   Plaintiff Isiah Robertson played Linebacker for the Los Angeles Rams from 1971 to 1978 and the Buffalo Bills from 1979 to 1982.

434.   Plaintiff Isiah Robertson suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

435.   Plaintiff Isiah Robertson was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

436.   Plaintiff Isiah Robertson suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## DAVID SMITH

437.   Plaintiff David Smith was born on November 11, 1965 and he currently resides in DeSoto, Texas.

438.   Plaintiff David Smith played Running Back for the Philadelphia Eagles in 1988 and the Dallas Cowboys in 1990.

439.   Plaintiff David Smith suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

440.   Plaintiff David Smith was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

///

-61-

**EX A, PAGE 80**

441.   Plaintiff David Smith suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## RALPH STOCKEMER

442.   Plaintiff Ralph Stockemer was born on December 20, 1962 and he currently resides in Plano, Texas.

443.   Plaintiff Ralph Stockemer played Running back for the San Diego Chargers in 1986 and the Kansas City Chiefs in 1987.

444.   Plaintiff Ralph Stockemer suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

445.   Plaintiff Ralph Stockemer was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

446.   Plaintiff Ralph Stockemer suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## BOBBY WATKINS JUNIOR

447.   Plaintiff Bobby Watkins Jr. was born on May 31, 1960 and he currently resides in DeSoto, Texas.

448.   Plaintiff Bobby Watkins Jr. played Defensive Back for the Detroit Lions from 1982 to 1988.

449.   Plaintiff Bobby Watkins Jr. suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

450.   Plaintiff Bobby Watkins Jr. was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

-62-

COMPLAINT FOR DAMAGES

451.   Plaintiff Bobby Watkins Jr. suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### MIKELL WILLIAMS

452.   Plaintiff Mikell Williams was born on November 22, 1953 and he currently resides in Covington, Louisiana.

453.   Plaintiff Mikell Williams played Defensive Back for the San Diego Chargers from 1975 to 1982 and the Los Angeles Rams in 1983.

454.   Plaintiff Mikell Williams suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

455.   Plaintiff Mikell Williams was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

456.   Plaintiff Mikell Williams suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### JEFFREY SEVERSON

457.   Plaintiff Jeffrey Severson was born on September 16, 1949 and he currently resides in Long Beach, California.

458.   Plaintiff Jeffrey Severson played Defensive Back for the Houston Oilers from 1973 to 1974, the Denver Broncos in 1977, and the St. Louis Cardinals in 1977.

459.   Plaintiff Jeffrey Severson suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

///

///

-63-

COMPLAINT FOR DAMAGES

**EX A, PAGE 82**

460.   Plaintiff Jeffrey Severson was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

461.   Plaintiff Jeffrey Severson suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### EVERETT LITTLE

462.   Plaintiff Everett Little was born on June 12, 1954 and he currently resides in Fort Worth, Texas.

463.   Plaintiff Everett Little played Guard for the Tampa Bay Buccaneers in 1976.

464.   Plaintiff Everett Little suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

465.   Plaintiff Everett Little was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

466.   Plaintiff Everett Little suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### BERNARDO HARRIS

467.   Plaintiff Bernardo Harris was born on October 15, 1971 and he currently resides in Chapel Hill, North Carolina.

468.   Plaintiff Bernardo Harris played Linebacker for the Green Bay Packers from 1995 to 2001 and the Baltimore Ravens in 2002.

469.   Plaintiff Bernardo Harris suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

-64-

COMPLAINT FOR DAMAGES

**EX A, PAGE 83**

470.   Plaintiff Bernardo Harris was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

471.   Plaintiff Bernardo Harris suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## ANTHONY BANKS

472.   Plaintiff Anthony Banks was born on April 5, 1973 and he currently resides in Irving, Texas.

473.   Plaintiff Anthony Banks played Quarterback for the St. Louis Rams from 1996 to 1999, the Baltimore Ravens from 1999 to 2000, the Washington Redskins in 2001, and the Houston Texans from 2003 to 2005.

474.   Plaintiff Anthony Banks suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

475.   Plaintiff Anthony Banks was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

476.   Plaintiff Anthony Banks suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## ANTHONY CURTIS

477.   Plaintiff Anthony Curtis was born on November 11, 1983 and he currently resides in Colleyville, Texas.

478.   Plaintiff Anthony Curtis played Tight End for the Dallas Cowboys from 2006 to 2008.

479.   Plaintiff Anthony Curtis suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

-65-

COMPLAINT FOR DAMAGES

**EX A, PAGE 84**

480.   Plaintiff Anthony Curtis was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

481.   Plaintiff Anthony Curtis suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## RONALD DAVIS

482.   Plaintiff Ronald Davis was born on February 24, 1974 and he currently resides in Marion, Arkansas.

483.   Plaintiff Ronald Davis played Linebacker for the Atlanta Falcons from 1995 to 1996 and the Green Bay Packers in 1999.

484.   Plaintiff Ronald Davis suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

485.   Plaintiff Ronald Davis was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

486.   Plaintiff Ronald Davis suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## JOHN MILKS

487.   Plaintiff John Milks was born on October 17, 1943 and he currently resides in Escondido, California.

488.   Plaintiff John Milks played Linebacker for the San Diego Chargers in 1966.

489.   Plaintiff John Milks suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

-66-

COMPLAINT FOR DAMAGES

**EX A, PAGE 85**

490. Plaintiff John Milks was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

491. Plaintiff John Milks suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## JOHN CORKER

492. Plaintiff John Corker was born on December 29, 1958 and he currently resides in Fort Worth, Texas.

493. Plaintiff John Corker played Linebacker for the Houston Oilers from 1980 to 1982 and the Green Bay Packers in 1988.

494. Plaintiff John Corker suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

495. Plaintiff John Corker was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

496. Plaintiff John Corker suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## WILLIAM RAY MICKENS

497. Plaintiff William Ray Mickens was born on January 4, 1973 and he currently resides in Westlake, Texas.

498. Plaintiff William Ray Mickens played Defensive Back for the New York Jets from 1996 to 2003, the Cleveland Browns in 2005, and the New England Patriots in 2006.

///

-67-

COMPLAINT FOR DAMAGES

**EX A, PAGE 86**

499.    Plaintiff William Ray Mickens suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

500.    Plaintiff William Ray Mickens was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

501.    Plaintiff William Ray Mickens suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### BRANDON CHRISTENSON

502.    Plaintiff Brandon Christenson was born on May 10, 1977 and he currently resides in Edmond, Oklahoma.

503.    Plaintiff Brandon Christenson played Tight End for the Oakland Raiders in 2002.

504.    Plaintiff Brandon Christenson suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

505.    Plaintiff Brandon Christenson was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

506.    Plaintiff Brandon Christenson suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### MICHAEL ALFORD

507.    Plaintiff Michael Alford was born on June 19, 1943 and he currently resides in Vestavia, Alabama.

508.    Plaintiff Michael Alford played Center for the St. Louis Cardinals in 1965 and the Detroit Lions in 1966.

-68-

COMPLAINT FOR DAMAGES

**EX A, PAGE 87**

509.   Plaintiff Michael Alford suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

510.   Plaintiff Michael Alford was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

511.   Plaintiff Michael Alford suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## REUBEN GIBSON

512.   Plaintiff Reuben Gibson was born on June 16, 1955 and he currently resides in Lake Spivey, Georgia.

513.   Plaintiff Reuben Gibson played Running Back for the Buffalo Bills in 1977 and the Atlanta Falcons in 1977.

514.   Plaintiff Reuben Gibson suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

515.   Plaintiff Reuben Gibson was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

516.   Plaintiff Reuben Gibson suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## LARRY BATES

517.   Plaintiff Larry Bates was born on March 21, 1954 and he currently resides in San Jose, California.

518.   Plaintiff Larry Bates played Running Back for the Seattle Seahawks in 1976.

COMPLAINT FOR DAMAGES

519.   Plaintiff Larry Bates suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

520.   Plaintiff Larry Bates was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

521.   Plaintiff Larry Bates suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### DONALD MOSEBAR

522.   Plaintiff Donald Mosebar was born on September 11, 1961 and he currently resides in Manhattan Beach, California.

523.   Plaintiff Donald Mosebar played Center for the Los Angeles Raiders from 1983 to 1994.

524.   Plaintiff Donald Mosebar suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

525.   Plaintiff Donald Mosebar was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

526.   Plaintiff Donald Mosebar suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### RICHARD VAN DRUTEN

527.   Plaintiff Richard Van Druten was born on September 23, 1962 and he currently resides in Plano, Texas.

528.   Plaintiff Richard Van Druten played Outside Linebacker for the Kansas City Chiefs in 1988.

///

-70-

COMPLAINT FOR DAMAGES

EX A, PAGE 89

529.   Plaintiff Richard Van Druten suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

530.   Plaintiff Richard Van Druten was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

531.   Plaintiff Richard Van Druten suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### DAVID RICHARDS

532.   Plaintiff David Richards was born on April 11, 1968 and he currently resides in Dallas, Texas.

533.   Plaintiff David Richards played Guard for the San Diego Chargers from 1988 to 1992, the Detroit Lions in 1993, and the Atlanta Falcons from 1994 to 1996.

534.   Plaintiff David Richards suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

535.   Plaintiff David Richards was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

536.   Plaintiff David Richards suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

### WILLIAM KEITH WRIGHT

537.   Plaintiff William Keith Wright was born on January 30, 1956 and he currently resides in Emory, Texas.

///

-71-

COMPLAINT FOR DAMAGES

EX A, PAGE 90

538.   Plaintiff William Keith Wright played Wide Receiver for the Cleveland Browns from 1978 to 1980.

539.   Plaintiff William Keith Wright suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

540.   Plaintiff William Keith Wright was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

541.   Plaintiff William Keith Wright suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## WALTER WILLIAMS

542.   Plaintiff Walter Williams was born on July 10, 1954 and he currently resides in Dallas, Texas.

543.   Plaintiff Walter Williams played Defensive Back for the Detroit Lions from 1977 to 1980 and the Minnesota Vikings from 1981 to 1983.

544.   Plaintiff Walter Williams suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

545.   Plaintiff Walter Williams was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

546.   Plaintiff Walter Williams suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

///

///

-72-

## CEPHUS WEATHERSPOON

547.   Plaintiff Cephus Weatherspoon was born on June 14, 1948 and he currently resides in Brea, California.

548.   Plaintiff Cephus Weatherspoon played Wide Receiver for the New Orleans Saints in 1972.

549.   Plaintiff Cephus Weatherspoon suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

550.   Plaintiff Cephus Weatherspoon was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

551.   Plaintiff Cephus Weatherspoon suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## ANDRE PRESIDENT

552.   Plaintiff Andre President was born on June 16, 1971 and he currently resides in Fort Worth, Texas.

553.   Plaintiff Andre President played Tight End for the Chicago Bears in 1995 and the New England Patriots in 1995.

554.   Plaintiff Andre President suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

555.   Plaintiff Andre President was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

556.   Plaintiff Andre President suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

-73-

COMPLAINT FOR DAMAGES

## RON SMITH

557.    Plaintiff Ron Smith was born on November 20, 1956 and he currently resides in West Jordan, Utah.

558.    Plaintiff Ron Smith played Wide Receiver for the Los Angeles Rams from 1978 to 1979, the San Diego Chargers from 1980 to 1981, and the Philadelphia Eagles from 1981 in 1983.

559.    Plaintiff Ron Smith suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

560.    Plaintiff Ron Smith was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

561.    Plaintiff Ron Smith suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## DEON ANDERSON

562.    Plaintiff Deon Anderson was born on January 27, 1983 and he currently resides in Coral Springs, Florida.

563.    Plaintiff Deon Anderson played Fullback for the Dallas Cowboys from 2007 to 2010.

564.    Plaintiff Deon Anderson suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

565.    Plaintiff Deon Anderson was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

566.    Plaintiff Deon Anderson suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

-74-

COMPLAINT FOR DAMAGES

**DONNELL SMITH**

567.   Plaintiff Donnell Smith was born on May 25, 1949 and he currently resides in Corona, California.

568.   Plaintiff Donnell Smith played Defensive End for the Green Bay Packers in 1971 and the New England Patriots from 1973 to 1974.

569.   Plaintiff Donnell Smith suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

570.   Plaintiff Donnell Smith was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

571.   Plaintiff Donnell Smith suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

**RICHARD STAFFORD**

572.   Plaintiff Richard Stafford was born on August 21, 1940 and he currently resides in Dallas, Texas.

573.   Plaintiff Richard Stafford played Defensive End for the Philadelphia Eagles from 1962 to 1963.

574.   Plaintiff Richard Stafford suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

575.   Plaintiff Richard Stafford was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

///

-75-

COMPLAINT FOR DAMAGES

**EX A, PAGE 94**

576.   Plaintiff Richard Stafford suffers from multiple past traumatic brain injuries with various symptoms including, but not limited to, sleeping problems, headaches and memory loss.

## COUNT I

## FRAUDULENT CONCEALMENT

## (Against NFL)

577.   Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

578.   For decades, the NFL knew that repetitive head impacts in football games and full-contact practices created a risk of harm to NFL players that was similar or identical to the risk of harm to, for example, boxers who receive repetitive impacts to the head during boxing practices and matches.

579.   For decades, the NFL was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of repetitive traumatic impacts to the head to which NFL players were exposed.

580.   The NFL knowingly and fraudulently concealed from NFL players and former NFL players the risks of head injuries, in particular the heightened risk created by returning to the playing field before making a proper recovery from their head injuries.

581.   From 1994 through June of 2010, the NFL voluntarily and repeatedly made material misrepresentations to its players, former players, the United States Congress, and the public at large that there was no link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

582.   The NFL's MTBI Committee published articles and the concussion pamphlet issued to players, therein affirmatively concealing and downplaying known risks of repetitive brain impacts to NFL players.

-76-

COMPLAINT FOR DAMAGES

**EX A, PAGE 95**

583.   The NFL's concussion pamphlet created an atmosphere of trust that the NFL had carefully undertaken its voluntary responsibility to research, test, study, and report accurate findings to the players and former players.  The NFL stated that "[w]e want to make sure all NFL players ... are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact of concussions."

584.   The concealment was ongoing.  Dr. Casson provided oral and written testimony at the 2010 congressional hearings in which he continued to deny the validity of other studies.  Dr. Casson also denied the link between repetitive brain impacts and short and long term brain damage in public interviews.

585.   The NFL, therefore, concealed facts and information which caused Plaintiffs to become exposed to the harm referenced above.  For those Plaintiffs who had retired prior to the above-mentioned misrepresentations, the NFL's concerted concealment of the risks to which they had been exposed on the playing field delayed their ability to plan for the future of themselves and their families and to seek appropriate treatment of their latent neurodegenerative conditions.

586.   The NFL knew and expected that Plaintiffs would rely on the inaccurate information provided by the NFL, and Plaintiffs in fact did rely on this inaccurate information during and after their NFL careers.

587.   As a direct and proximate result of the NFL's fraudulent conduct, Plaintiffs have suffered physical injury, including, but not limited to, existing and latent cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, and economic losses.

588.   As a direct and proximate result of the NFL's willful concealment, Plaintiffs have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

///

-77-

COMPLAINT FOR DAMAGES

**EX A, PAGE 96**

589.  As a result of the Defendants' misconduct as alleged herein, Defendants are liable to Plaintiffs for the full measure of damages allowed under applicable law.

## COUNT II

## FRAUD

## (Against the NFL)

590.  Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

591.  For decades, the NFL knew that repetitive head impacts in football games and practices circumstances created a risk of harm to NFL players that was similar or identical to the risk of harm to boxers who receive repetitive impacts to the head during boxing practices and matches.

592.  For decades, the NFL was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of repetitive traumatic impacts to the head to which NFL players were exposed

593.  The NFL, however, withheld this information from NFL players and ignored the risks to NFL players.

594.  From 1994 through June of 2010, the NFL made material misrepresentations to its players, former players, the United States Congress, and the public at large that there was no scientifically proven link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

595.  The NFL and its agents intended to defraud the Plaintiffs.

596.  The Plaintiffs justifiably and reasonably relied on the NFL's omissions and misrepresentations to their detriment.

597.  As a result of the NFL's misconduct as alleged herein, the NFL is liable to Plaintiffs.

-78-

COMPLAINT FOR DAMAGES

**EX A, PAGE 97**

598.   The Plaintiffs were damaged by the NFL's misconduct. They have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

599.   As a result of the NFL's fraud, the NFL is liable to Plaintiffs for the full measure of damages allowed under applicable law.

## COUNT III

## NEGLIGENT MISREPRESENTATION

## (Against the NFL)

600.   Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

601.   For decades, the NFL knew that repetitive head impacts in football game and practices circumstances created a risk of harm to NFL players that was similar or identical to the risk of harm to boxers who receive repetitive impacts to the head during boxing practices and matches.

602.   For decades, the NFL was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of repetitive traumatic impacts to the head to which NFL players were exposed.

603.   The NFL, however, withheld this information from NFL players and ignored the risks to NFL players.

604.   From 1994 through June of 2010, the NFL made material misrepresentations to its players, former players, the United States Congress, and the public at large that there was no scientifically proven link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

-79-

COMPLAINT FOR DAMAGES

605. Defendant NFL, therefore, misrepresented the dangers the Plaintiffs faced in returning to action after sustaining a head injury and the long-term effects of continuing to play football after a head injury.

606. The NFL's MTBI Committee made public statements, published articles, and issued the concussion pamphlet to its players, which the NFL knew or should have known were misleading, downplaying and obfuscating to NFL players the true and serious risks of repetitive traumatic head impacts.

607. The MTBI Committee made material misrepresentations on multiple occasions, including but not limited to testimony at congressional hearings and other information issued to current and former NFL Players.

608. The Defendant's misrepresentations included the false statement that present NFL players were not at an increased risk of short- and long-term adverse consequences if they returned too soon to an NFL games or practices after suffering head trauma and, therefore, that former players had not been exposed to such increased risk during their time in the NFL.

609. The NFL's misrepresentations included ongoing and baseless criticism of legitimate scientific studies that set forth the dangers and risks of head impacts which NFL players regularly sustained.

610. The NFL made these misrepresentations and actively concealed true information at a time when it knew, or should have known, because of its superior position of knowledge, that the Plaintiffs faced health problems if they returned to a game too soon after sustaining a concussion.

611. The NFL knew or should have known the misleading nature of their statements when they were made.

///

-80-

COMPLAINT FOR DAMAGES

612.   The NFL made the misrepresentations and actively concealed information with the intention that the Plaintiffs would rely on the misrepresentations or omissions in selecting a course of action.

613.   As a result of the NFL's misrepresentations, Defendants are liable to Plaintiffs.

614.   As a direct and proximate result of the NFL's negligent misrepresentations, Plaintiffs have suffered and continue to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, emotional distress, and loss of consortium.  Plaintiffs seek the full measure of damages allowed under applicable law.

## COUNT IV
## NEGLIGENCE
### (Against the NFL)

615.   Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

616.   The NFL, by and through its monopoly power, has historically had a duty to protect the health and safety of its players, including Plaintiffs, and the public, including but not limited to, a duty to use reasonable care in researching, study and/or examining the dangers and risks of head injuries and/or concussions to NFL players, to inform and warn their players of such risks and to effectuate reasonable league policies and/or take other reasonable action to minimize the risks of head injuries.

617.   In the early 1990's, the NFL voluntarily undertook to study the issue of neurocognitive injuries in former NFL players.

618.   In 1994, in connection with that voluntary undertaking, the NFL created the aforementioned MTBI Committee.

619.   The NFL recognized that its voluntary undertaking to study and report information about the effect of head impacts on NFL players would not just be for the benefit of then-present and former NFL

-81-

COMPLAINT FOR DAMAGES

**EX A, PAGE 100**

players alone. Since the NFL is the most prominent and influential entity in the sport of football, the NFL knew or should have known that its MBTI Committee's statements would have a broad public impact.

620. By voluntarily undertaking to study and report on the issue of the neurocognitive effects of head impacts in professional football, the NFL assumed its long-standing duty to exercise reasonable care in the MTBI Committee's work and the NFL and its agents' public statements about the substance of the Committee's work.

621. Further, the NFL was well aware of 80 years of documented science and medicine linking CTE to repeated concussion and cumulative problems from collusion sports including boxing and football.

622. However, the MBTI Committee negligently performed the NFL's voluntarily undertaken research mission.

623. In addition, from 1994 through June of 2010, the NFL and its MBTI Committee made material misrepresentations to players, former players, the United States Congress, and the public at large that there was no scientifically valid link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

624. The NFL's failure to exercise reasonable care and its breach of duty increased the risk that the Plaintiffs would suffer long-term neurocognitive injuries.

625. The NFL failed to properly inform the public and other football leagues and players of the health risks associated with concussive injuries.

626. The NFL failed to license and approve the best equipment available that will reduce the risk of concussive brain injury.

627. The Plaintiffs reasonably relied to their detriment on the NFL's actions and omissions on the subject.

///

-82-

COMPLAINT FOR DAMAGES

628.   Under all of the above circumstances, it was foreseeable that the NFL's failure to exercise reasonable care in the execution of its voluntarily undertaken duties would cause or substantially contribute to the personal injuries suffered by the Plaintiffs.

629.   The NFL's failure to exercise reasonable care in the execution of its duties proximately caused or contributed to Plaintiffs' injuries.

630.   As a result of the NFL's negligence, the NFL is liable to Plaintiffs, and the Plaintiffs are entitled to all damages allowed by applicable law.

## COUNT V

## LOSS OF CONSORTIUM

### (Against All Defendants)

631.   Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

632.   As a result of the named Defendants' misconduct, the named Defendants are liable to Plaintiffs' Spouses.

633.   As a direct and proximate result of the intentional misconduct, carelessness, negligence, and recklessness, the Plaintiffs have sustained the aforesaid injuries, and the Plaintiffs' Spouses have been damaged as follows:

    a.   They have been and will continue to be deprived of the services, society and companionship of their respective husbands;

    b.   They have, will be and will continue to be required to spend money for medical care and household care for the treatment of their respective husbands; and,

    c.   They have been and will continue to be deprived of the earnings of their respective husbands.

-83-

COMPLAINT FOR DAMAGES

**EX A, PAGE 102**

634.  As a result of the injuries, the Plaintiffs' Spouses are entitled to damages, as alleged herein or allowed by law.

## COUNT VI
## NEGLIGENT HIRING

635.  Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

636.  The NFL had a long-standing duty of studying the relationship between repetitive head impacts in football and brain injury.

637.  In doing so, the NFL had a duty to the Plaintiffs and the general public to retain and employ persons within the MTBI Committee who were professionally competent to study and render opinions on that bio-medical issue and to ensure that those whom it hired had the professional and personal qualifications to conduct those studies and render opinions that were scientifically rigorous, valid, defensible, and honest.

638.  The NFL breached its duty to the Plaintiffs and the general public by hiring persons who:

a.    were unqualified,

b.    were not competent to engage in rigorous and defensible scientific research,

c.    were not competent to render valid and defensible opinions,

d.    created fraudulent industry-funded research; and/or

e.    attacked as not credible the valid and defensible research and opinions generated by neuro-scientists who were unconnected to and not paid by the NFL.

-84-

COMPLAINT FOR DAMAGES

639.   The NFL's negligence in failing to retain competent and honest members of the MTBI Committee resulted in a body of falsified industry-funded research that purposefully and/or negligently suppressed valid and truthful bio-medical science. The NFL's negligence allowed the MTBI Committee to use falsified industry-funded research to mislead the Plaintiffs, other former NFL players, and the general public regarding the risks associated with repetitive head impacts in the game of football.

640.   As a result of the NFL's failure, the Plaintiffs have sustained brain injuries that are progressive and latent and did not take protective measures or seek the diagnosis and treatment they would have sought had they been told the truth.

**COUNT VII**
**NEGLIGENT RETENTION**
**(Against the NFL)**

641.   Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

642.   The NFL knew or should have known that the incompetent persons it hired for the MTBI Committee demonstrated on an ongoing basis their lack of competence and inadequate judgment to study and render expert opinions on the issue of the relationship between repetitive head impacts in football and brain injury.

643.   The NFL had a long-standing duty to the Plaintiffs and the general public not to allow those incompetent persons it had hired within the MTBI Committee to continue to conduct incompetent and falsified studies and render incompetent opinions on the relationship between repetitive head impacts in football and brain injury.

644.   During the time period when the MTBI was conducting its purported research and rendering its purported opinions, the NFL knew or should have known that the purported research and opinions of the MTBI were false and indefensible.

-85-

COMPLAINT FOR DAMAGES

EX A, PAGE 104

645.   The NFL breached its duty to the Plaintiffs and the general public by allowing these incompetent and unqualified persons, under the auspices and with the imprimatur of the NFL:

   a.   to continue to create incompetent and indefensible research,

   b.   to continue to render invalid and indefensible opinions, and

   c.   to continue to attack the credible and defensible research and opinions of neuro-scientists not connected to or paid by the NFL.

646.   The NFL's negligence allowed the incompetent members of the MTBI Committee to continue to advance their false and incompetent research and opinions in an attempt to suppress valid bio-medical science.  The NFL's negligence allowed the MTBI Committee members to mislead the Plaintiffs, other former NFL players, and the general public regarding the permanent brain injury risks associated with repetitive head impacts in the game of football.

647.   As a result of the NFL's failure, the Plaintiffs have sustained brain injuries that are progressive and latent and did not take protective measures or seek the diagnosis and treatment they would have sought had they been told the truth.

## COUNT VIII

## WRONGFUL DEATH AND SURVIVAL ACTIONS

### (Against All Defendants)

648.   Plaintiff and his respective Personal Representative incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

649.   The Plaintiff's Personal Representative brings this action in her capacity as Personal Representative of the deceased Plaintiff and on behalf of the respective survivors of that Plaintiff.

-86-

COMPLAINT FOR DAMAGES

**EX A, PAGE 105**

650.   As a direct and proximate cause of the conduct alleged herein, the Defendants caused the Plaintiffs to develop the debilitating brain diseases and conditions set forth above, which diseases and conditions caused extreme pain, suffering, and anguish and, ultimately, the death of a Plaintiff.

651.   The Personal Representative of the deceased Plaintiff claims damages recoverable under applicable law for all pecuniary and non-pecuniary losses suffered by the deceased Plaintiff by reason of his death.

652.   As a direct and proximate result of the untimely death of the Plaintiff, his respective survivors have been deprived of the earnings, maintenance, guidance, support and comfort that they would have received from for the rest of the respective Plaintiff's natural life, and have suffered commensurate pecuniary and non-pecuniary losses because of the Plaintiff's wrongful death.

653.   The Plaintiff's Personal Representative claims the full measure of damages allowed under applicable law.

## COUNT IX
## NEGLIGENCE
### (Against NFL Defendants)

654.   Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

655.   NFL Defendants breached its duty to ensure that the equipment it licensed and approved were of the highest possible quality and sufficient to protect the NFL players, including Plaintiffs, from the risk of concussive brain injuries.

656.   NFL Defendants breached its duty by licensing the Riddell Defendants' helmets, and approving and/or requiring the use of the helmets for the NFL players, knowing or having reason to know

-87-

COMPLAINT FOR DAMAGES

**EX A, PAGE 106**

that the helmets were negligently and defectively designed and/or manufactured and lacked an adequate warning concerning the risks of concussion injury.

657. As a result of these breaches by NFL Defendants, Plaintiffs suffer personal injuries as a result of the long-term health effects of concussive brain injuries.

## COUNT X
## STRICT LIABILITY FOR DESIGN DEFECT
### (Against Riddell)

658. Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

659. At the time the helmets were designed, manufactured, sold, and distributed by Riddell, the helmets were defective in design, unreasonably dangerous, and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury. The design defect includes, but is not limited to the following:

(a) Negligently failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

(a) Negligently designing the subject helmet with a shock attenuating system which was not safely configured;

(b) Negligently failing to properly and adequately test the helmet model;

(c) Other acts of negligence that may be discovered during the course of this matter; and

(d) Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury.

-88-

COMPLAINT FOR DAMAGES

**EX A, PAGE 107**

660. The defective design and unreasonably dangerous condition were a proximate and producing cause of the personal injuries suffered by the Plaintiffs and other damages, including but not limited to, economic damages and non-economic damages.

661. At all times, the helmets were being used for the purpose for which they were intended.

662. Riddell is strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were proximate and producing causes of the personal injuries and other damages including, but not limited to, economic damage as alleged herein. A safer alternative design was economically and technologically feasible at the time the product left the control of Riddell.

## COUNT XI
## FAILURE TO WARN
### (Against Riddell)

663. Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

664. Riddell knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the helmets.

665. Riddell failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

666. Riddell failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

///
///
///

-89-

COMPLAINT FOR DAMAGES

**EX A, PAGE 108**

667.   Riddell failed to warn players of risk of long term brain injury from repeated concussions so that they could make an informed decision on returning to play post concussion.

668.   Riddell knew that these substantial dangers were not readily recognizable to an ordinary consumer or user and that such person would use these products without inspection for defects.

669.   Plaintiffs neither knew, nor had reason to know of the existence of the aforementioned defects, or increased risks of harm.

670.   Plaintiffs were using the helmets in a reasonably foreseeable manner at all times.

671.   Plaintiffs' damages were the legal and proximate result of the actions of Riddell who owed a duty to warn Plaintiffs of the risks of substantial harm associated with the foreseeable use of their products.

672.   Riddell's failure to warn caused the Plaintiffs' personal injuries.

## COUNT XII
## NEGLIGENCE
## (Against Riddell)

673.   Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

674.   Riddell was negligent in its design, testing, assembly, manufacture, marketing, and engineering of the helmets as described herein.

675.   Riddell owed a duty of care to the Plaintiffs in their design, testing, manufacture, assembly, marketing and sale of the helmets and all components and sub-assemblies of the helmets.

676.   Riddell should have been well aware that since 1928 repeated blows to the head can lead to CTE, commonly known as "punch-drunk syndrome".

///
///

-90-

COMPLAINT FOR DAMAGES

**EX A, PAGE 109**

677.   Riddell breached its duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football using their helmets.

678.   As a result of Riddell's breach of duty, Plaintiffs have sustained permanent injury.

## COUNT XIII

## CIVIL CONSPIRACY/FRAUDULENT CONCEALMENT

### (Against NFL)

679.   Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

680.   The named defendants, along with others who were employed by the NFL to participate as its MTBI Committee, acted in concert to perpetrate the fraudulent concealment of the connection between repetitive MTBI and long-term neuro-cognitive damage, illness, and decline.

681.   The named Defendants, along with those who participated in the concerted efforts referenced above, knowingly made continuing misrepresentations of material fact and disputed and affirmatively misrepresented that there was an absence of any scientific basis to believe that repetitive MTBI created any known long-term neuro-cognitive risks to NFL players.  That misconduct by the named Defendants exposed Plaintiffs to an increased risk of brain injury and was the proximate cause of the Plaintiffs' brain injuries.

682.   Plaintiffs have suffered personal injuries as a result of the named defendants' concerted activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.   For compensatory and general damages according to proof;

-91-

---

COMPLAINT FOR DAMAGES

2.    For special and incidental damages according to proof;

3.    For punitive damages according to proof;

4.    For costs of the proceedings herein; and

5.    For all such other and further relief as the Court deems just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: October 25, 2012

By:

GIRARDI | KEESE
Thomas Girardi (California Bar No. 36603)
Graham LippSmith (California Bar No. 221984)
Celene S. Chan (California Bar No. 260267)
1126 Wilshire Boulevard
Los Angeles, California 90017
Telephone: (213) 977-0211
Facsimile: (213) 481-1554

RUSSOMANNO & BORRELLO, P.A.
Herman J. Russomanno (Florida Bar No. 240346)
Robert J. Borrello (Florida Bar No. 764485)
150 West Flagler Street - PH 2800
Miami, FL 33130
Telephone: (305) 373-2101
Facsimile: (305) 373-2103

GOLDBERG, PERSKY & WHITE, P.C.
Jason E. Luckasevic (Pennsylvania Bar No. 85557)
1030 Fifth Avenue
Pittsburgh, PA 15219
Telephone: (412) 471-3980
Facsimile: (412) 471-8308

*Attorneys for Plaintiffs*

-92-

COMPLAINT FOR DAMAGES

**EX A, PAGE 111**

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Thomas V. Girardi, SBN: 36603<br>GIRARDI \| KEESE<br>1126 Wilshire Boulevard<br>Los Angeles, CA 90017 | |

TELEPHONE NO.: (213)977-0211    FAX NO. (Optional): (213)481-1554

E-MAIL ADDRESS (Optional):

ATTORNEY FOR (Name): Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, 90017
BRANCH NAME: Central District

PLAINTIFF/PETITIONER: JOSEPH SWEET, et al.

DEFENDANT/RESPONDENT: NATIONAL FOOTBALL LEAGUE, et al.

NOTICE OF RELATED CASE

CASE NUMBER:

JUDICIAL OFFICER:

DEPT.:

Identify, in chronological order according to date of filing, all cases related to the case referenced above.

1. a. Title: VERNON MAXWELL, et al. v. NATIONAL FOOD LEAGUE
   b. Case number: 2:12-CV-01023 AB
   c. Court: ☐ same as above
      ☒ other state or federal court (name and address): USDC - CENTRAL 312 N. Spring Street
      Los Angeles, CA 90012
   d. Department:
   e. Case type: ☐ limited civil  ☒ unlimited civil  ☐ probate  ☐ family law  ☐ other (specify):

   f. Filing date: 7/19/11
   g. Has this case been designated or determined as "complex?"  ☐ Yes  ☒ No
   h. Relationship of this case to the case referenced above (check all that apply):
      ☒ involves the same parties and is based on the same or similar claims.
      ☒ arises from the same or substantially identical transactions, incidents, or events requiring the determination of
        the same or substantially identical questions of law or fact.
      ☐ involves claims against, title to, possession of, or damages to the same property.
      ☒ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

        ☐ Additional explanation is attached in attachment 1h
   i. Status of case:
      ☒ pending
      ☐ dismissed  ☐ with  ☐ without prejudice
      ☐ disposed of by judgment

2. a. Title: PEAR, et al. v. NATIONAL FOOTBALL LEAGUE
   b. Case number: 2:12-CV 0125AB
   c. Court: ☐ same as above
      ☒ other state or federal court (name and address): USDC - CENTRAL 312 N. Spring Street
      Los Angeles, CA 90012
   d. Department:

Form Approved for Optional Use
Judicial Council of California
CM-015 [Rev. July 1, 2007]

NOTICE OF RELATED CASE

Legal
Solutions
Plus

Cal. Rules of Court, rule 3.300

EX A, PAGE 112

**CM-015**

| PLAINTIFF/PETITIONER:   JOSEPH SWEET, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:   NATIONAL FOOTBALL LEAGUE, et al. | |

**2.** *(continued)*

    **e.** Case type:  [ ] limited civil  [X] unlimited civil  [ ] probate  [ ] family law  [ ] other *(specify):*

    **f.** Filing date: 8/03/11

    **g.** Has this case been designated or determined as "complex?"  [ ] Yes  [X] No

    **h.** Relationship of this case to the case referenced above *(check all that apply):*

        [X] involves the same parties and is based on the same or similar claims.

        [X] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        [ ] involves claims against, title to, possession of, or damages to the same property.

        [X] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            [ ] Additional explanation is attached in attachment 2h

    **i.** Status of case:

        [X] pending

        [ ] dismissed  [ ] with  [ ] without prejudice

        [ ] disposed of by judgment

**3. a.** Title:  Henderson, et al. v. NATIONAL FOOTBALL LEAGUE, et al.

    **b.** Case number:   CV-12-04761 R(Manx)

    **c.** Court:  [ ] same as above

        [ ] other state or federal court *(name and address):*   USDC - CENTRAL 312 N. Spring Street  Los Angeles, CA 90012

    **d.** Department:

    **e.** Case type:  [ ] limited civil  [X] unlimited civil  [ ] probate  [ ] family law  [ ] other *(specify):*

    **f.** Filing date: 05/03/11

    **g.** Has this case been designated or determined as "complex?"  [ ] Yes  [X] No

    **h.** Relationship of this case to the case referenced above *(check all that apply):*

        [X] involves the same parties and is based on the same or similar claims.

        [X] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        [ ] involves claims against, title to, possession of, or damages to the same property.

        [ ] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            [ ] Additional explanation is attached in attachment 3h

    **i.** Status of case:

        [X] pending

        [ ] dismissed  [ ] with  [ ] without prejudice

        [ ] disposed of by judgment

**4.** [ ] Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: October 25, 2012

Thomas V. Girardi

(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)        ►        (SIGNATURE OF PARTY OR ATTORNEY)

---

CM-015 [Rev. July 1, 2007]        **NOTICE OF RELATED CASE**        Page 2 of 3

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Thomas V. Girardi, SBN: 36603<br>GIRARDI \| KEESE<br>1126 Wilshire Boulevard<br>Los Angeles, CA 90017 | **CONFORMED COPY<br>OF ORIGINAL FILED**<br>Los Angeles Superior Court<br><br>**OCT 25 2012**<br><br>John A. Clarke, Executive Officer/Clerk<br>By_____, Deputy<br>SHAUNYA WESLEY |

TELEPHONE NO.: (213)977-0211    FAX NO.: (213)977-0211
ATTORNEY FOR (Name): PLAINTIFFS

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Central District

CASE NAME: JOSEPH SWEET, et al. v. NFL, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] Unlimited   [ ] Limited<br>(Amount    (Amount<br>demanded   demanded is<br>exceeds $25,000)   $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **BC494568**<br>JUDGE:<br>DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[x] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought (check all that apply): a. [x] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action (specify): Thirteen (13)
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: October 25, 2012

Thomas V. Girardi
_____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET**   Legal<br>Solutions<br>Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |

**EX A, PAGE 114**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract (*not unlawful detainer or wrongful eviction*)
  Contract/Warranty Breach—Seller Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case—Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage (*not provisionally complex*) (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment (*non-domestic relations*)
  Sister State Judgment
  Administrative Agency Award (*not unpaid taxes*)
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-harassment*)
  Mechanics Lien
  Other Commercial Complaint Case (*non-tort/non-complex*)
  Other Civil Complaint (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (*not specified above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

**EX A, PAGE 115**

| SHORT TITLE: JOSEPH SWEET, et al. v. NFL, et al. | CASE NUMBER BC494568 |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? [X] YES CLASS ACTION? [ ] YES LIMITED CASE? [ ] YES TIME ESTIMATED FOR TRIAL 5-7 HOURS/[X] DAYS

**Item II. Indicate the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):**

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | [ ] A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | [ ] A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | [ ] A6070 Asbestos Property Damage | 2. |
| | | [ ] A7221 Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | [X] A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | [ ] A7210 Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | [ ] A7240 Other Professional Health Care Malpractice | 1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | [ ] A7250 Premises Liability (e.g., slip and fall) | 1., 4. |
| | | [ ] A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | [ ] A7270 Intentional Infliction of Emotional Distress | 1., 3. |
| | | [ ] A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

| LACIV 109 (Rev. 03/11) LASC Approved 03-04 | CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION | Local Rule 2.0 Page 1 of 4 |
|---|---|---|

LA-CV109

**EX A, PAGE 116**

| SHORT TITLE: | JOSEPH SWEET, et al. v. NFL, et al. | CASE NUMBER |
|---|---|---|

| | A. Civil Case Cover Sheet Category No. | B. Type of Action (Check only one) | C. Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation      Number of parcels _____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 2 of 4

**EX A, PAGE 117**

SHORT TITLE: JOSEPH SWEET, et al. v. NFL, et al.

CASE NUMBER

| A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|
| **Judicial Review** | | |
| Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2., 6. |
| Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus | 2., 8. |
| | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2. |
| | ☐ A6153 Writ - Other Limited Court Case Review | 2. |
| Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | | |
| Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1., 2., 8. |
| Construction Defect (10) | ☐ A6007 Construction Defect | 1., 2., 3. |
| Claims involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1., 2., 8. |
| Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1., 2., 8. |
| Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1., 2., 3., 8. |
| Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | | |
| Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment | 2., 9. |
| | ☐ A6160 Abstract of Judgment | 2., 6. |
| | ☐ A6107 Confession of Judgment (non-domestic relations) | 2., 9. |
| | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | ☐ A6112 Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | | |
| RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1., 2., 8. |
| Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only | 1., 2., 8. |
| | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | | |
| Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2., 8. |
| Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment | 2., 3., 9. |
| | ☐ A6123 Workplace Harassment | 2., 3., 9. |
| | ☐ A6124 Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | ☐ A6190 Election Contest | 2. |
| | ☐ A6110 Petition for Change of Name | 2., 7. |
| | ☐ A6170 Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | ☐ A6100 Other Civil Petition | 2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

EX A, PAGE 118

| SHORT TITLE: JOSEPH SWEET, et al. v. NFL, et al. | CASE NUMBER |
|---|---|

**Item III.** *Statement of Location:* Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☐1. ☐2. ☐3. ☐4. ☐5. ☐6. ☐7. ☒8. ☐9. ☐10. | ADDRESS:  818 W. 7th Street |
|---|---|
| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90017 |

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the __Los Angeles__ courthouse in the __Central__ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: Oct. 25, 2012

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)
Thomas V. Girardi

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4

**EX A, PAGE 119**

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE (NON-CLASS ACTION)

Case Number _____

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 3.3(c)). There is additional information on the reverse side of this form.

## BC494568

| ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM | |
|---|---|---|---|---|---|---|---|
| Hon. Carolyn B. Kuhl | 1 | 534 | | Hon. Debre Katz Weintraub | 47 | 507 | |
| Hon. Michael P. Linfield | 10 | 631 | | Hon. Elizabeth Allen White | 48 | 506 | |
| Hon. Barbara A. Meiers | 12 | 636 | | Hon. Deirdre Hill | 49 | 509 | |
| Hon. Terry A. Green | 14 | 300 | | Hon. John L. Segal | 50 | 508 | |
| Hon. Richard Fruin | 15 | 307 | | Hon. Abraham Khan | 51 | 511 | |
| Hon. Rita Miller | 16 | 306 | | Hon. Susan Bryant-Deason | 52 | 510 | |
| Hon. Richard E. Rico | 17 | 309 | | Hon. Steven J. Kleifield | 53 | 513 | |
| Hon. Kevin C. Brazile | 20 | 310 | | Hon. Ernest M. Hiroshige | 54 | 512 | |
| Hon. Robert L. Hess | 24 | 314 | | Hon. Malcolm H. Mackey | 55 | 515 | |
| Hon. Mary Ann Murphy | 25 | 317 | | Hon. Michael Johnson | 56 | 514 | |
| Hon. James R. Dunn | 26 | 316 | | Hon. Ralph W. Dau | 57 | 517 | |
| Hon. Yvette M. Palazuelos | 28 | 318 | | Hon. Rolf M. Treu | 58 | 516 | |
| Hon. Barbara Scheper | 30 | 400 | | Hon. David L. Minning | 61 | 632 | |
| Hon. Alan S. Rosenfield | 31 | 407 | | Hon. Michael L. Stern | 62 | 600 | |
| Hon. Mary H. Strobel | 32 | 406 | | Hon. Mark Mooney | 68 | 617 | |
| Hon. Charles F. Palmer | 33 | 409 | | Hon. Ramona See | 69 | 621 | |
| Hon. Amy D. Hogue | 34 | 408 | | Hon. Soussan G. Bruguera | 71 | 729 | |
| Hon. Daniel Buckley | 35 | 411 | | Hon. Ruth Ann Kwan | 72 | 731 | |
| Hon. Gregory Alarcon | 36 | 410 | | Hon. Teresa Sanchez-Gordon | 74 | 735 | |
| Hon. Joanne O'Donnell | 37 | 413 | | Hon. William F. Fahey | 78 | 730 | |
| Hon. Maureen Duffy-Lewis | 38 | 412 | | **Hon. Emilie H. Elias** | **324** | **CCW** | |
| Hon. Michelle R. Rosenblatt | 40 | 414 | | **Hon. Elihu M. Berle** | **323** | **CCW** | |
| Hon. Ronald M. Sohigian | 41 | 417 | | other | | | |
| Hon. Holly E. Kendig | 42 | 416 | | | | | |
| Hon. Mel Red Recana | 45 | 529 | | | | | |
| Hon. Fredrick C. Shaller | 46 | 601 | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____   JOHN A. CLARKE, Executive Officer/Clerk

By _____, Deputy Clerk

LACIV CCH 190 (Rev. 01/12)
LASC Approved  05-06
For Optional Use

**NOTICE OF CASE ASSIGNMENT –**

**UNLIMITED CIVIL CASE**

Page 1 of 2

EX A, PAGE 120

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

For additional ADR information and forms visit the Court ADR web application at **www.lasuperiorcourt.org** (click on ADR).

The plaintiff/petitioner shall serve a copy of this form on each defendant/respondent along with the complaint (Civil only).

**What is ADR:**
Alternative Dispute Resolution (ADR) is the term used to describe all the other options available for settling a dispute which once had to be settled in court. ADR processes, such as arbitration, mediation, neutral evaluation, and settlement conference are less formal than a court process and provide opportunities for parties to reach an agreement using a problem-solving approach.

There are many different kinds of ADR. All of them utilize a "neutral", an impartial person, to decide the case or help the parties reach an agreement.

**Arbitration:**
In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

> **Cases for Which Arbitration May Be Appropriate**
> Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.
>
> **Cases for Which Arbitration May Not Be Appropriate**
> If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Mediation:**
In mediation, a neutral person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

> **Cases for Which Mediation May Be Appropriate**
> Mediation may be particularly useful when parties have a dispute between or among family members, neighbors, or business partners. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.
>
> **Cases for Which Mediation May Not Be Appropriate**
> Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Neutral Evaluation:**
In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

> **Cases for Which Neutral Evaluation May Be Appropriate**
> Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.
>
> **Cases for Which Neutral Evaluation May Not Be Appropriate**
> Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conference:**
A settlement conference may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

| | | |
|---|---|---|
| LAADR 005 (Rev. 01-12)<br>LASC Adopted 10-03<br>For Mandatory Use | **ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION** | Cal. Rules of Court, rule 3.221<br>Page 1 of 2 |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## DISPUTE RESOLUTION PROGRAM ACT (DRPA) PROVIDERS

JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK                              ALTERNATIVE DISPUTE RESOLUTION (ADR) DEPARTMENT

California Rules of Court, rule 3.221, requires counties participating in the Dispute Resolution
Programs Act (DRPA) to provide information about the availability of local dispute resolution
programs funded under DRPA.  For more information regarding these programs, contact the Los
Angeles County Department of Community and Senior Services Contracts Administration Office at
213-738-2621.  The following is a list of the local dispute resolution programs funded in Los Angeles
County.

Superior Court of California, County of Los Angeles, ADR Office 213-974-5425
www.lasuperiorcourt.org/ADR

---

**STAFF AND VOLUNTEERS OF THE FOLLOWING AGENCIES ARE NOT EMPLOYEES OF THE
SUPERIOR COURT:**

---

Asian-Pacific American Dispute Resolution Center 213-250-8190 www.apadrc.org

California Academy of Mediation Professionals 818-377-7250 www.campmediation.org

California Lawyers for the Arts, Arbitration, and Mediation Service 310-998-5590
www.calawyersforthearts.org

Center for Civic Mediation 877-473-7658 213-896-6533 www.centerforcivicmediation.org

Center for Conflict Resolution 818-705-1090 www.ccr4peace.org

Centinela Youth Services, City of Hawthorne 310-970-7702 www.cys.la.org

Inland Valleys Justice Center 877-832-9325 www.ivjc.org

Korean American Coalition 4.29 Dispute Resolution Center 213-365-5999 www.kacla.org

Los Angeles County Department of Consumer Affairs, Dispute Settlement Services 213-974-0825
www.dca.lacounty.gov

Loyola Law School, The Center for Conflict Resolution 213-736-1145 www.lls.edu/ccr

Norwalk Dispute Resolution Program 562-929-5603 www.ci.norwalk.ca.us/socialservices2.asp

Office of the Los Angeles City Attorney, Dispute Resolution Program 213-485-8324
www.atty.lacity.org/mediate

---

**THE PROGRAMS LISTED ABOVE DO NOT OFFER LEGAL ADVICE OR HELP YOU
RESPOND TO A SUMMONS; HOWEVER, THEY MAY ASSIST IN RESOLVING YOUR
PROBLEM THROUGH MEDIATION.**

---

LAADR 007 (Rev. 01-12)          **DISPUTE RESOLUTION PROGRAM ACT (DRPA) PROVIDERS**          Cal. Rules of Court, rule 3.221
LASC Adopted 07-04                                                                                                  Page 1 of 1
For Mandatory Use

EX A, PAGE 122

| NAME, ADDRESS, TELEPHONE, FAX, and E-MAIL: | STATE BAR NUMBER: | Reserved for Clerk's File Stamp |
|---|---|---|

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:
Click on the button to select the appropriate court address.

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| STIPULATION TO PARTICIPATE IN ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: |
|---|---|

The undersigned parties in the above-titled action stipulate to participate in the Alternative Dispute Resolution (ADR) process checked below:

☐ Mediation                     ☐ Neutral Evaluation

☐ Arbitration (non-binding)     ☐ Settlement Conference

☐ Arbitration (binding)         ☐ Other ADR Process *(describe):* _____

| Dated | Name of Stipulating Party<br>☐ Plaintiff    ☐ Cross-complainant<br>☐ Defendant   ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|---|
| Dated | Name of Stipulating Party<br>☐ Plaintiff    ☐ Cross-complainant<br>☐ Defendant   ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| Dated | Name of Stipulating Party<br>☐ Plaintiff    ☐ Cross-complainant<br>☐ Defendant   ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| Dated | Name of Stipulating Party<br>☐ Plaintiff    ☐ Cross-complainant<br>☐ Defendant   ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| Dated | Name of Stipulating Party<br>☐ Plaintiff    ☐ Cross-complainant<br>☐ Defendant   ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| Dated | Name of Stipulating Party<br>☐ Plaintiff    ☐ Cross-complainant<br>☐ Defendant   ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| Dated | Name of Stipulating Party<br>☐ Plaintiff    ☐ Cross-complainant<br>☐ Defendant   ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| Dated | Name of Stipulating Party<br>☐ Plaintiff    ☐ Cross-complainant<br>☐ Defendant   ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |

☐ Number of additional pages attached to this document: _____.

LAADR 001 (Rev. 04-12)
LASC Approved 10-04
For Optional Use

**STIPULATION TO PARTICIPATE IN
ALTERNATIVE DISPUTE RESOLUTION (ADR)**

Cal. Rules of Court, rule 3.221
Page 1 of 1

**EX A, PAGE 123**

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

**EX A, PAGE 124**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                         FAX NO. (Optional): | | |
| E-MAIL ADDRESS (Optional): | | |
| ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lasuperiorcourt.org* under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
          (INSERT DATE)                          (INSERT DATE)
   complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation.

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date: _____

_____    ➤   _____
    (TYPE OR PRINT NAME)              (ATTORNEY FOR PLAINTIFF)

Date: _____

_____    ➤   _____
    (TYPE OR PRINT NAME)              (ATTORNEY FOR DEFENDANT)

Date: _____

_____    ➤   _____
    (TYPE OR PRINT NAME)              (ATTORNEY FOR DEFENDANT)

Date: _____

_____    ➤   _____
    (TYPE OR PRINT NAME)              (ATTORNEY FOR DEFENDANT)

Date: _____

_____    ➤   _____
    (TYPE OR PRINT NAME)          (ATTORNEY FOR _____ )

Date: _____

_____    ➤   _____
    (TYPE OR PRINT NAME)          (ATTORNEY FOR _____ )

Date: _____

_____    ➤   _____
    (TYPE OR PRINT NAME)          (ATTORNEY FOR _____ )

EX A, PAGE 126

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:
E-MAIL ADDRESS (Optional):         FAX NO. (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

    iii.   Be filed within two (2) court days of receipt of the Request; and

    iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

**EX A, PAGE 129**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:                    FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| INFORMAL DISCOVERY CONFERENCE<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:
   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference
2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).
3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).
4. For a Request for Informal Discovery Conference, **briefly** describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, **briefly** describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.

LACIV 094 (new)                    **INFORMAL DISCOVERY CONFERENCE**
LASC Approved 04/11                 (pursuant to the Discovery Resolution Stipulation of the parties)

**EX A, PAGE 130**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

FAX NO. (Optional):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

**EX A, PAGE 131**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date: _____

_____        ➤    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR PLAINTIFF)

Date: _____

_____        ➤    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR DEFENDANT)

Date: _____

_____        ➤    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR DEFENDANT)

Date: _____

_____        ➤    _____
(TYPE OR PRINT NAME)                               (ATTORNEY FOR DEFENDANT)

Date: _____

_____        ➤    (ATTORNEY FOR _____)
(TYPE OR PRINT NAME)

Date: _____

_____        ➤    (ATTORNEY FOR _____)
(TYPE OR PRINT NAME)

Date: _____

_____        ➤    (ATTORNEY FOR _____)
(TYPE OR PRINT NAME)

**THE COURT SO ORDERS.**

Date: _____        _____
                                                          JUDICIAL OFFICER

**EX A, PAGE 132**

NOTICE SENT TO:

Girardi | Keese
1126 Wilshire Boulevard
Los Angeles      CA   90017

**FILED**

LOS ANGELES SUPERIOR COURT

OCT 3 0 2012

JOHN A. CLARKE, CLERK

BY GERALD MACK, DEPUTY

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | CASE NUMBER |
|---|---|
| JOSEPH SWEET ET AL<br><div align="center">Plaintiff(s),</div><br>VS.<br><br>NATIONAL FOOTBALL LEAGUE ET AL<br><div align="center">Defendant(s).</div> | BC494568<br><br>**NOTICE OF CASE<br>MANAGEMENT CONFERENCE** |

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled for <u>February 25, 2013</u> at <u>8:31 am</u> in <u>Dept. 69</u> at 111 North Hill Street, Los Angeles, California  90012.

**NOTICE TO DEFENDANT:     THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.**

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least **15 calendar days** prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, section 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions pursuant to LASC Local Rule 7.13, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code Section 68608 (b), and California Rules of Court 2.2 et seq.

Date:  October 30, 2012

<div align="center">(Judicial Officer)</div>

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named above:

[X] by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed herein in a separate sealed envelope to each address as shown above with postage thereon fully prepaid.

[ ] by personally giving the party notice upon filing the complaint.

Date:  October 30, 2012

<div align="right">John A. Clarke, Executive Officer/Clerk</div>

<div align="right">by _____ Deputy Clerk</div>

LACIV 132 (Rev. 09/07)
LASC Approved 10-03

<div align="right">Cal. Rules of Court, rule 3.720-3.730<br>LASC Local Rules, Chapter Seven</div>

NOTICE SENT TO:

Russomanno & Borrello, P.A.
150 West Flagler Street, PH 2800
Miami          FL  33130



**FILED**
LOS ANGELES SUPERIOR COURT

OCT 30 2012

JOHN A. CLARKE, CLERK
BY GERALD MATEO
DEPUTY

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

JOSEPH SWEET ET AL
                              Plaintiff(s),
                    VS.

NATIONAL FOOTBALL LEAGUE ET AL
                              Defendant(s).

| CASE NUMBER |
| BC494568 |

## NOTICE OF CASE MANAGEMENT CONFERENCE

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled for  February 25, 2013  at  8:31 am  in  Dept. 69
at 111 North Hill Street, Los Angeles, California  90012.

**NOTICE TO DEFENDANT:**    **THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.**

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least **15 calendar days** prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, section 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions pursuant to LASC Local Rule 7.13, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code Section 68608 (b), and California Rules of Court 2.2 et seq.

Date:  October 30, 2012

                                   Judicial Officer

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named above:

[ ] by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed herein in a separate sealed envelope to each address as shown above with postage thereon fully prepaid.

[   ] by personally giving the party notice upon filing the complaint.

Date:  October 30, 2012

                                   John A. Clarke, Executive Officer/Clerk

                          by                         , Deputy Clerk

LACIV 132 (Rev. 09/07)                                    Cal. Rules of Court, rule 3.720-3.730
LASC Approved 10-03                                       LASC Local Rules, Chapter Seven

NOTICE SENT TO:

Goldberg, Persky & White, P.C.
1030 Fifth Ave.
Pittsburgh          PA   15219



**FILED**
LOS ANGELES SUPERIOR COURT
FILE STAMP
OCT 30 2012
JOHN A. CLARKE, CLERK
BY GERALD MACK, DEPUTY

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | CASE NUMBER |
|---|---|
| JOSEPH SWEET ET AL      Plaintiff(s), <br><br> VS. <br><br> NATIONAL FOOTBALL LEAGUE ET AL      Defendant(s). | BC494568 <br><br> **NOTICE OF CASE MANAGEMENT CONFERENCE** |

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled for February 25, 2013 at 8:31 am in Dept. 69 at 111 North Hill Street, Los Angeles, California 90012.

**NOTICE TO DEFENDANT:**    **THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.**

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least **15 calendar days** prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, section 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions pursuant to LASC Local Rule 7.13, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code Section 68608 (b), and California Rules of Court 2.2 et seq.

Date: October 30, 2012

_____
Judicial Officer

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named above:

[X] by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed herein in a separate sealed envelope to each address as shown above with postage thereon fully prepaid.

[ ] by personally giving the party notice upon filing the complaint.

Date: October 30, 2012

John A. Clarke, Executive Officer/Clerk

by _____, Deputy Clerk

LACIV 132 (Rev. 09/07)
LASC Approved 10-03

Cal. Rules of Court, rule 3.720-3.730
LASC Local Rules, Chapter Seven



NOTICE SENT TO:

Russomanno & Borrello, P.A.
150 West Flagler Street, PH 2800
Miami FL 33130

FILED
LOS ANGELES SUPERIOR COURT
OCT 30 2012
JOHN A. CLARKE, CLERK
BY GERALD MACK, DEPUTY

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| JOSEPH SWEET ET AL<br>Plaintiff(s),<br>VS.<br>NATIONAL FOOTBALL LEAGUE ET AL<br>Defendant(s). | CASE NUMBER<br>BC494568<br><br>**ORDER TO SHOW CAUSE HEARING** |

useJ
To the party/attorney of record:_

You are ordered to appear for an Order to Show Cause Hearing on December 21, 2012 at 8:30 am in Dept. 69 of this court, Central District, 111 North Hill Street, Los Angeles, California 90012, and show cause why sanctions should not be imposed for:

**Failure to file Proof of Service of [ ] Petition [ ] Summons and [ ] Complaint [ ] Cross-Complaint pursuant to California Rules of Court, rule 3.110(b) and (c) as to:** _

Failure to comply or appear may result in sanctions, pursuant to one or more of the following: California Rules of Court, rule 2.30, and rule 3.1340; Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.310, 583.360, 583.410, 583.420, 583.430; and Government Code section 68608.

[ ] To avoid a mandatory appearance all required documents must be filed in [ ] this Dept [ ] Clerk's Office, Room ____________ at least 5 court days prior to the date of the hearing.

[ ] The Court may infer from your failure to appear that possession of the premises is no longer at issue, and that your case is not entitled to preference in setting pursuant to Code of Civil Procedure section 1179a.

[ ] You are ordered to give notice of said hearing forthwith to any party served with summons and complaint prior to OSC Hearing and file a Proof of Service in this department or Clerk's Office at least 5 court days prior to the date of the hearing.

Dated: October 30, 2012

Judicial Officer

**CERTIFICATE OF MAILING**

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Order to Show Cause Hearing upon each party or counsel named above by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown above with the postage thereon fully prepaid.

Date: October 30, 2012

John A. Clarke, EXECUTIVE OFFICER/CLERK

By ______________, Deputy Clerk

ORDER TO SHOW CAUSE HEARING

**LACIV 166-1 (Rev. 09/08)**
**LASC Approved 06-04**

**LASC Local Rules, Chapter 7**
**Cal. Rules of Court, rule 2.30**

NOTICE SENT TO:

Goldberg, Persky & White, P.C.
1030 Fifth Ave.
Pittsburgh        PA   15219

**FILED**
FILE STAMP
LOS ANGELES SUPERIOR COURT

OCT 3 0 2012

JOHN A. CLARKE, CLERK

BY GERALD MACK, DEPUTY

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

JOSEPH SWEET ET AL

Plaintiff(s),

VS.

NATIONAL FOOTBALL LEAGUE ET AL

Defendant(s).

CASE NUMBER

BC494568

**ORDER TO SHOW CAUSE HEARING**

useJ

To the party/attorney of record: ___

You are ordered to appear for an Order to Show Cause Hearing on _December 21, 2012_ at _8:30 am_ in _Dept. 69_ of this court, Central District, 111 North Hill Street, Los Angeles, California 90012, and show cause why sanctions should not be imposed for:

**Failure to file Proof of Service of [ ] Petition [ ] Summons and [ ] Complaint [ ] Cross-Complaint pursuant to California Rules of Court, rule 3.110(b) and (c) as to:** ___

Failure to comply or appear may result in sanctions, pursuant to one or more of the following: California Rules of Court, rule 2.30, and rule 3.1340; Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.310, 583.360, 583.410, 583.420, 583.430; and Government Code section 68608.

[ ] To avoid a mandatory appearance all required documents must be filed in [ ] this Dept [ ] Clerk's Office, Room _____ at least 5 court days prior to the date of the hearing.

[ ] The Court may infer from your failure to appear that possession of the premises is no longer at issue, and that your case is not entitled to preference in setting pursuant to Code of Civil Procedure section 1179a.

[ ] You are ordered to give notice of said hearing forthwith to any party served with summons and complaint prior to OSC Hearing and file a Proof of Service in this department or Clerk's Office at least 5 court days prior to the date of the hearing.

Dated: _October 30, 2012_

Judicial Officer

## CERTIFICATE OF MAILING

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Order to Show Cause Hearing upon each party or counsel named above by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown above with the postage thereon fully prepaid.

Date: _October 30, 2012_

John A. Clarke, EXECUTIVE OFFICER/CLERK

By _____, Deputy Clerk

### ORDER TO SHOW CAUSE HEARING

LACIV 166-1 (Rev. 09/08)
LASC Approved 06-04

LASC Local Rules, Chapter 7
Cal. Rules of Court, rule 2.30

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Graham B. LippSmith, 221984<br>Girardi \| Keese<br>1126 Wilshire Blvd.<br>Los Angeles, CA 90017<br>TELEPHONE NO.: (213) 977-0211<br>ATTORNEY FOR (Name): Plaintiff | **FILED**<br>Los Angeles Superior Court<br><br>OCT 3 1 2012<br><br>John A. Clarke, Executive Officer/Clerk<br>By _____, Deputy<br>SHAUNYA WESLEY |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF |
|---|
| Superior Court of California, Los Angeles County<br>600 S. Commonwealth Avenue<br>Los Angeles, CA 90005-4001 |

| PLAINTIFF/PETITIONER: Joseph Sweet | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: National Football League | BC494568 69 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>29076 |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.
2. I served copies of:    Summons, Civil Case Cover Sheet, Complaint, Civil Case Cover Sheet Addendum, Notice, Notice of Assignment

3. a. Party served:  Easton-Bell Sports, Inc. LLC

   b. Person Served: CSC - Becky DeGeorge - Person authorized to accept service of process
4. Address where the party was served:  2710 N Gateway Oaks Dr Ste 150
                                         Sacramento, CA  95833
5. I served the party
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 10/30/2012        (2) at  (time): 3:19 PM
6. The "Notice to the Person Served" (on the summons) was completed as follows:

   c. on behalf of:



   Easton-Bell Sports, Inc. LLC


   under:      CCP 416.10 (corporation)
7. **Person who served papers**
   a. Name:         Tyler Dimaria
   b. Address:      One Legal - 194-Marin
                    504 Redwood Blvd #223
                    Novato, CA  94947

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 35.95
   e I am:
      (3) registered California process server.
         (i)  Employee or independent contractor.
         (ii) Registration No.: 2006-06
         (iii) County: SACRAMENTO

BY FAX

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.
Date:  10/30/2012


          Tyler Dimaria                                              _____
   (NAME OF PERSON WHO SERVED PAPERS)                                      (SIGNATURE)

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |
|---|---|---|

OL# 6794063

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Graham B. LippSmith, 221984<br>Girardi \| Keese<br>1126 Wilshire Blvd.<br>Los Angeles, CA 90017<br>TELEPHONE NO.: (213) 977-0211<br>ATTORNEY FOR *(Name)*: Plaintiff | **FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES<br><br>NOV 02 2012<br><br>John A. Clarke, Executive Officer/Clerk<br>BY_____, Deputy<br>Ishavia Chambers |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF |
|---|
| Superior Court of California, Los Angeles County<br>111 N. Hill Street<br>Los Angeles, CA 90012 |

| PLAINTIFF/PETITIONER: Sweet, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: National Football League, et al. | BC494568 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>29076 |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Summons, Complaint Civil Case Cover Sheet, Civil Case Cover Sheet Addendum, Notice of Related Case, Notice of Case Assignment, ADR Information Package

## BY FAX

3. a. Party served:  EB Sports Corp.

   b. Person Served: APRIL CALZADA - Person authorized to accept service of process

4. Address where the party was served:  7855 Haskell Ave. #350<br>   Van Nuys, CA  91406

5. I served the party
   b. **by substituted service.** On (date): 11/1/2012     at (time): 2:30 PM   I left the documents listed in item 2 with or in the presence of: APRIL CALZADA
     (1) **(business)**  a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

     (4) A declaration of mailing is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   c. on behalf of:

   EB Sports Corp.

   under:    Other: Business Organization Form Unknown

7. **Person who served papers**
   a. Name:      Humberto Palacio
   b. Address:    One Legal - 194-Marin<br>                504 Redwood Blvd #223<br>                Novato, CA  94947
   c. Telephone number: 415-491-0606
   d. The fee for service was:  $ 104.65
   e. I am:
     (3) registered California process server.
        (i) Employee or independent contractor.
        (ii) Registration No. 2627
        (iii) County LOS ANGELES

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 11/2/2012

    Humberto Palacio                          _____
    (NAME OF PERSON WHO SERVED PAPERS)           (SIGNATURE)

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |
|---|---|---|

OL# 6794064

**EX A, PAGE 139**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):* | | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|---|
| Graham B. LippSmith, 221984<br>Girardi \| Keese<br>1126 Wilshire Blvd.<br>Los Angeles, CA 90017 | | (213) 977-0211 | |
| ATTORNEY FOR *(Name):*   Plaintiff | Ref. No. or File No.<br>29076 | | |

Insert name of court, judicial district or branch court, if any:

Superior Court of California, Los Angeles County
111 N. Hill Street
Los Angeles, CA 90012

| PLAINTIFF:<br><br>  Sweet, et al. | |
|---|---|
| DEFENDANT:<br><br>  National Football League, et al. | |
| **PROOF OF SERVICE BY MAIL** | CASE NUMBER:<br>BC494568 |

I am a citizen of the United States, over the age of 18 and not a party to the within action.  My business address is 504 Redwood Blvd #223, Novato, CA 94947.

On 11/2/2012, after substituted service under section CCP 415.20(a) or 415.20(b) or FRCP 4(e)(2)(B) or FRCP 4(h)(1)(B) was made, I mailed copies of the:

Summons, Complaint Civil Case Cover Sheet, Civil Case Cover Sheet Addendum, Notice of Related Case, Notice of Case Assignment, ADR Information Package

# BY FAX

to the person to be served at the place where the copies were left by placing a true copy thereof enclosed in a sealed envelope, with First Class postage thereon fully prepaid, in the United States Mail at Los Angeles, CA, California, addressed as follows:

EB Sports Corp.
APRIL CALZADA
7855 Haskell Ave. #350
Van Nuys, CA 91406

I am readily familiar with the firm's practice for collection and processing of documents for mailing.  Under that practice, it would be deposited within the United States Postal Service, on that same day, with postage thereon fully prepaid, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

$ 104.65

Mikhail Globus
One Legal - 194-Marin
504 Redwood Blvd #223
Novato, CA 94947

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on 11/2/2012 at Los Angeles, California.

Mikhail Globus

OL# 6794064

---

**EX A, PAGE 140**



POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Graham B. LippSmith, 221984<br>Girardi \| Keese<br>1126 Wilshire Blvd.<br>Los Angeles, CA 90017<br>TELEPHONE NO.: (213) 977-0211<br>ATTORNEY FOR *(Name):* Plaintiff | **FILED**<br>Los Angeles Superior Court<br>**NOV 06 2012**<br>John A. Clarke, Executive Officer/Clerk<br>By _____, Deputy<br>KATAY MORALES |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF |
|---|
| Superior Court of California, Los Angeles County<br>600 S. Commonwealth Avenue<br>Los Angeles, CA 90005-4001 |

| PLAINTIFF/PETITIONER: Joseph Sweet et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: National Football League, et al. | BC494568 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>29076    D169 |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Summons, Civil Case Cover Sheet, Civil Case Cover Sheet Addendum, Notice, Notice of Case Assignment, ADR Information

**BY FAX**

3. a. Party served: National Football League

   b. Person Served: Anastasia Danias - Person authorized to accept service of process

4. Address where the party was served: 345 Park Ave.
   New York, NY 10017

5. I served the party
   a. **by personal service. I** personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) or *(date):* 11/5/2012    (2) at *(time):* 12:40 PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   c. on behalf of:

   National Football League

   under:    CCP 416.40 (association or partnership)

7. Person who served papers
   a. Name:    Jesse Goldman
   b. Address:    One Legal - 194-Marin
                504 Redwood Blvd #223
                Novato, CA 94947
   c. Telephone number: 415-491-0606

   d. The fee for service was: $ 159.95
   e. I am:
      (1) Not a registered California process server.

8. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: 11/6/2012

Jesse Goldman
(NAME OF PERSON WHO SERVED PAPERS)                    (SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 1767569

**EX A, PAGE 141**

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Graham B. LippSmith, 221984<br>Girardi \| Keese<br>1126 Wilshire Blvd.<br>Los Angeles, CA 90017<br>TELEPHONE NO.: (213) 977-0211<br>ATTORNEY FOR (Name): Plaintiff | **FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>NOV 16 2012<br><br>John A. Clarke, Executive Officer/Clerk<br>By _____, MOSES SOTO, Deputy |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF<br>Superior Court of California, Los Angeles County<br>111 N. Hill St.<br>Los Angeles, CA 90012 | |
| PLAINTIFF/PETITIONER: Joseph Sweet et al. | CASE NUMBER:<br>BC494568   D109 |
| DEFENDANT/RESPONDENT: NFL et al. | |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>29076 |

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Summons, Civil Case Cover Sheet, Civil Case Cover Sheet Addendum, Notice of Related Case, Notice of
   Assignment, ADR Information

**BY FAX**

3. a. Party served: NFL Properties LLC

   b. Person Served: Scott Lascala - The Corporation Trust Company - Person authorized to accept service of process

4. Address where the party was served: 1209 Orange Street
                                       Wilmington, DE  19801

5. I served the party
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to
      receive service of process for the party (1) on (date): 11/1/2012          (2) at (time):  3:15 PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:

   c. on behalf of:

   NFL Properties LLC

   under:      Other: Limited Liability Company

7. Person who served papers
   a. Name:        Daniel Newcomb
   b. Address:     One Legal - 194-Marin
                   504 Redwood Blvd #223
                   Novato, CA  94947
   c. Telephone number: 415-491-0606

   d. The fee for service was:  $ 89.95
   e. I am:
      (1) Not a registered California process server.

8. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: 11/9/2012

Daniel Newcomb
(NAME OF PERSON WHO SERVED PAPERS)                    _____
                                                     (SIGNATURE)

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>(Rev. Jan 1, 2007) | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br><br>OL# 1767570 |

001M546271768.tif - 11/14/2012 9:18:46 AM

**EX A, PAGE 142**

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Graham B. LippSmith, 221984
Girardi | Keese
1126 Wilshire Blvd.
Los Angeles, CA 90017
TELEPHONE No.: (213) 977-0211
ATTORNEY FOR (Name): Plaintiff

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, Los Angeles County
111 N. Hill St.
Los Angeles, CA 90012

PLAINTIFF/PETITIONER: Joseph Sweet et al.

DEFENDANT/RESPONDENT: National Football League, et al.

PROOF OF SERVICE OF SUMMONS

FOR COURT USE ONLY

**FILED**
Superior Court of California
County of Los Angeles

**NOV 16 2012**

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
MOSES SOTO

CASE NUMBER:
BC494568 D69

Ref. No. or File No.:
29076

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Summons; Civil Case Cover Sheet; Civil Case Cover Sheet Addendum; Complaint; Notice of Related Case; Notice of Case Assignment; ADR Information

BY FAX

3. a. Party served: All American Sports Corporation, d/b/a Ridell/All American

   b. Person Served: Sue Rhea - Prentice Hall Corp System - Person authorized to accept service of process

4. Address where the party was served: 2711 Centerville Rd., Ste. 400
   Wilmington, DE 19808

5. I served the party
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 11/1/2012   (2) at (time): 2:54 PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   c. on behalf of:

   All American Sports Corporation, d/b/a Ridell/All American

   under: CCP 416.10 (corporation)

7. Person who served papers
   a. Name:        Daniel Newcomb
   b. Address:     One Legal - 194-Marin
                   504 Redwood Blvd #223
                   Novato, CA 94947
   c. Telephone number: 415-491-0606

   d. The fee for service was: $ 89.95
   e. I am:
       (1) Not a registered California process server.

8. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: 11/9/2012

Daniel Newcomb
(NAME OF PERSON WHO SERVED PAPERS)                    (SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 1767572

001M546271768.tif - 11/14/2012 9:18:46 AM

**EX A, PAGE 143**

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Graham B. LippSmith, 221984<br>Girardi | Keese<br>1126 Wilshire Blvd.<br>Los Angeles, CA 90017<br>TELEPHONE NO.: (213) 977-0211<br>ATTORNEY FOR *(Name):* Plaintiff | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**NOV 16 2012**<br>John A. Clarke, Executive Officer/Clerk<br>By_____ Deputy<br>MOSES SOTO |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF

Superior Court of California, Los Angeles County
111 N Hill St.
Los Angeles, CA 90012

PLAINTIFF/PETITIONER: Joseph Sweet et al.

DEFENDANT/RESPONDENT: National Football League, et al.

| | CASE NUMBER: |
|---|---|
| | BC494568   D69 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>29076 |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Summons; Civil Case Cover Sheet; Civil Case Cover Sheet Addendum; Complaint; Notice of Related Case; Notice of Case Assignment; ADR Information

**BY FAX**

3. a. Party served: Riddell Sports Group, Inc.

   b. Person Served: Sue Rhea - Corporation Service Company - Person authorized to accept service of process

4. Address where the party was served: 2711 Centerville Road Suite 400
   Wilmington, DE  19808

5. I served the party
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) or *(date):* 11/1/2012      (2) at *(time):*  2:54 PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   c. on behalf of:

   Riddell Sports Group, Inc.

   under:     CCP 416.10 (corporation)

7. Person who served papers
   a. Name:          Daniel Newcomb
   b. Address:       One Legal - 194-Marin
                     504 Redwood Blvd #223
                     Novato, CA  94947
   c. Telephone number: 415-491-0606
   d. The fee for service was:  $ 52.95
   e. I am:
      (1)  Not a registered California process server.

8. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: 11/9/2012

Daniel Newcomb
(NAME OF PERSON WHO SERVED PAPERS)                                    (SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 1767573

001M546271768.tif - 11/14/2012 9:18:46 AM

**EX A, PAGE 144**